NOT FOR PUBLICATION

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

| | | |
|---|---|---|
| KELVIN ROSA, | : | Civ. Action No. 20-4686 (RMB) |
| | : | |
| Petitioner | : | |
| | : | |
| v. | : | **OPINION** |
| | : | |
| JAMES SLAUGHTER, | : | |
| ADMINISTRATOR | : | |
| and ATTORNEY GENERAL | : | |
| OF THE STATE OF NEW JERSEY, | : | |
| Respondents | : | |
| | : | |

RENÉE MARIE BUMB, Chief United States District Judge

This matter comes before the Court upon Petitioner Kelvin Rosa's

("Petitioner") amended petition for a writ of habeas corpus under 28 U.S.C. § 2254,

challenging his 2012 state court conviction on burglary, robbery, and attempted

murder charges. (Dkt. No. 9.) Respondents filed an answer opposing habeas relief

(Dkt. Nos. 17, 18), and Petitioner filed a reply brief. (Dkt. No. 21.) For the reasons

set forth below, the Court grants the amended petition for writ of habeas corpus.

## I.  PROCEDURAL HISTORY

On Petitioner's direct appeal of his conviction, the New Jersey Superior Court,

Appellate Division provided this summary of the procedural posture:

> On October 3, 2006, a grand jury indicted defendant...on
> charges including: second-degree conspiracy to commit
> burglary, N.J.S.A. 2C:5-2(a)(1) and 2C:18-2(a)(1) (count

one); second-degree burglary while purposely, knowingly, or recklessly inflicting, or attempting to inflict, or threatening to inflict bodily injury on another, N.J.S.A. 2C:18-2(a)(1) and (b)(1) (count two); second-degree burglary while armed with a deadly weapon, N.J.S.A. 2C:18-2(a)(1) and (b)(2) (count three); first-degree armed robbery, N.J.S.A. 2C:15-1(a)(1) and (b) (count four); first-degree robbery with an attempt to kill, or purposely inflict or attempt to inflict serious bodily injury upon another, N.J.S.A. 2C:15-1(a)(1) and (b) (count five); first-degree attempted murder, N.J.S.A. 2C:5-1 and 2C:11-3(a)(1) (count six); second-degree aggravated assault with attempt to cause serious bodily injury, or causing such injury purposely or knowingly, or under circumstances manifesting extreme indifference to the value of human life recklessly causing such injury, N.J.S.A. 2C:12-1(b)(1) (count seven); third-degree aggravated assault with attempt to cause, or purposely or knowingly causing bodily injury to another with a deadly weapon, N.J.S.A. 2C:12-1(b)(2) (count eight); third-degree theft by unlawful taking, N.J.S.A. 2C:20-3(a) (count nine); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a) (count ten); third-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b) (count eleven); and receiving stolen property, N.J.S.A. 2C:20-7(a) (count twelve).

. . . .

[T]he jury found defendant guilty of conspiracy to commit burglary (count one), armed burglary (count three), armed robbery (count four), attempted murder (count six), aggravated assault (count seven), and theft by unlawful taking (count nine). On February 2, 2012, the court merged the armed robbery and aggravated assault convictions (counts four and seven) into the attempted murder conviction (count six) and sentenced defendant to twenty years, subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. The court merged the conspiracy and theft by unlawful taking convictions (counts one and nine) into the burglary conviction (count three), and sentenced defendant to a consecutive term of ten years, also subject to NERA. The court also ordered

> defendant to serve a period of parole supervision after his
> incarceration.
>
> In sentencing defendant, the court found aggravating
> factors one, the nature and circumstances of the offense,
> and the role of the actor therein, <u>N.J.S.A.</u> 2C:44-1(a)(1),
> three, the risk defendant will commit another offense,
> <u>N.J.S.A.</u> 2C:44-1(a)(3), eight, that defendant committed
> the offense against a police or other law enforcement
> officer acting in the performance of his duties while in
> uniform or exhibiting evidence of his authority, <u>N.J.S.A.</u>
> 2C:44-1(a)(8), and nine, the need for deterring defendant
> and others from violating the law, <u>N.J.S.A.</u> 2C:44-1(a)(9).
> The court found mitigating factor seven, that defendant
> had no history of prior delinquency or criminal activity,
> <u>N.J.S.A.</u> 2C:44-1(b)(7), and consented to a reduction of
> the primary parole eligibility date pursuant to <u>N.J.S.A.</u>
> 30:4-123.67.

(Dkt. No. 17-13 at 2-4, 16-17.)[1]

Petitioner timely filed a notice of appeal with the New Jersey Superior Court,

Appellate Division. (Dkt. No. 17-10.) On August 3, 2015, the Appellate Division

affirmed Petitioner's convictions but remanded for resentencing. (Dkt. No. 17-13.)

Petitioner filed a notice of petition for certification in the New Jersey Supreme Court,

which was denied. (Dkt. Nos. 17-18, 17-20.)  In September 2016, Petitioner filed his

first petition for post-conviction relief ("PCR").  (Dkt. No. 17-21.) The Honorable

Terrence Cook, J.S.C. dismissed Petitioner's PCR petition without prejudice. (Dkt.

No. 17-22). On September 13, 2017, Petitioner filed a supplemental PCR petition.

(Dkt. 17-23.) Judge Cook denied Petitioner's PCR petition without an evidentiary

---

[1] This Court cites to the state court record using the docket entry ("Dkt No.") and page
number assigned by this Court's case management electronic case filing system
"CM/ECF."

hearing. (Dkt. No. 17-26.) On August 15, 2018, Petitioner filed a notice of appeal
(Dkt. No. 17-27), and on April 20, 2020, the Appellate Division affirmed the denial
of Petitioner's first PCR petition. (Dkt. No. 17-35.) The New Jersey Supreme Court
denied Petitioner's petition for certification. (Dkt. No. 17-38.) On November 23,
2020, Petitioner filed a second PCR petition. (Dkt. No. 17-39.) On January 26, 2021,
Judge Cook denied the petition on the grounds that the second PCR petition was
untimely. (Dkt. 17-40, 17-41.)

On March 25, 2020, Petitioner filed his petition for writ of habeas corpus
under 28 U.S.C. § 2254 in this Court, acknowledging he had not yet exhausted his
post-conviction relief appeals and seeking a stay and abeyance. (Dkt. No. 1.) On
December 4, 2020, Petitioner informed this Court that he had exhausted his state
court remedies and requested leave to amend his petition. (Dkt. No. 7.) This Court
granted Petitioner's motion to amend his petition (Dkt. No. 8), and Petitioner filed
an amended petition on January 6, 2021. (Dkt. No. 9.)

## II.   DISCUSSION

### A.   Standard of Review

Prior to bringing a federal habeas petition under 28 U.S.C. § 2254(b)(1)(A), a
state prisoner must exhaust his state remedies. Nevertheless, "[a]n application for a
writ of habeas corpus may be denied on the merits, notwithstanding the failure of the
applicant to exhaust the remedies available in the courts of the State." § 2254(b)(2). If
a state prisoner's constitutional claim has been barred in the state courts on
independent and adequate state law grounds, there has been a procedural default,

4

and a habeas court cannot review the claim absent a showing of cause and prejudice or actual innocence. *Coleman v. Thompson*, 501 U.S. 722, 729, 750 (1991).

If a constitutional claim has been exhausted,

> [a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The Third Circuit directed habeas courts to follow a two-step analysis under § 2254(d)(1). *See Rosen v. Superintendent Mahanoy SCI*, 972 F.3d 245, 253 (3d Cir. 2020) (citing *Matteo v. Superintendent, SCI Albion*, 171 F.3d 877, 888 (3d Cir. 1999) (*en banc*), *cert. denied* 528 U.S. 824 (1999)). First, courts should "determine what the clearly established Supreme Court decisional law was at the time Petitioner's conviction became final" and "identify whether the Supreme Court has articulated a rule specific enough to trigger 'contrary to' review." *Id.* at 253 (quoting *Fischetti v. Johnson*, 384 F.3d 140, 148 (3d Cir. 2004)). "The 'clearly established Federal law' provision requires Supreme Court decisions to be viewed through a 'sharply focused lens.'" *Id.* Clearly established law "refers to the holdings, as opposed to

the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). A decision is "contrary to" a Supreme Court holding within 28 U.S.C. § 2254(d)(1), only if the state court applies a rule that "contradicts the governing law set forth in [the Supreme Court's] cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a [different result.]" *Williams*, 529 U.S. at 405-06.

Second, if Supreme Court precedent is not specific enough to trigger contrary review, habeas courts should "evaluate whether the state court unreasonably applied the relevant body of precedent." *Rosen*, 972 F.3d at 253 (quoting *Matteo*, 171 F.3d at 888)). Under § 2254(d)(1), "an unreasonable application of federal law is different from an incorrect application of federal law." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Williams*, 529 U.S. at 410). For relief under this provision, the state court's decision "evaluated objectively" must have "resulted in an outcome that cannot reasonably be justified under existing Supreme Court precedent." *Rosen*, 972 F.3d at 252 (quoting *Matteo*, 171 F.3d at 890)). A habeas court must frame the "relevant question as whether a fairminded jurist could reach a different conclusion." *Shinn v. Kayer*, 141 S. Ct. 517, 524 (2020) or, in other words, whether "every fairminded jurist would disagree" with the state court. *Mays v. Hines*, 141 S. Ct. 1145, 1149 (2021).

A petitioner who claims that the state court's adjudication of his claim was based on an unreasonable factual determination under § 2254(d)(2), faces a similarly heavy burden of proof because "a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1); *see also Miller-El v. Cockerell*, 537 U.S. 322, 340 (2003). "The petitioner must show that the state court verdict was based on an unreasonable determination of the evidence and that a reasonable factfinder could not have reached the same conclusion." *Rosen*, 972 F.3d at 252 (3d Cir. 2020) (citing *Campbell v. Vaughn*, 209 F.3d 280, 291 (3d Cir. 2000)).

"Although state prisoners may sometimes submit new evidence in federal court," the habeas statute, "is designed to strongly discourage them from doing so." *Cullen v. Pinholster*, 563 U.S. 170, 186 (2011). "Provisions like §§ 2254(d)(1) and (e)(2) ensure that '[f]ederal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings.'" *Id.* (quoting *Williams*, 529 U.S. at 437 (additional citations omitted)). Review under § 2254(d)(1) is limited to the record before the state court that adjudicated the claim on the merits. *Pinholster*, 563 U.S. at 180-81.

## B.    Appellate Division's Findings of Fact on Direct Appeal

Habeas review is deferential to a state court's determination of facts. 28 U.S.C. § 2254(e)(1) provides that

> [i]n a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the

> judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

On Petitioner's direct appeal of his conviction, the Appellate Division made the following findings of fact.

> On October 3, 2006, a grand jury indicted defendant with co-defendants Christian Nunez-Torres, Justo Dilone, Leonardo Jiminez, and Pablo Acevedo, charging them with various crimes committed in connection with the burglary of a check cashing business in Willingboro, on October 14, 2004 (the Willingboro burglary), during which Willingboro police officer Richard Rodgers was shot. …

> Prior to trial, the court granted the State's motion under N.J.R.E. 404(b), to admit "other crimes" evidence to establish defendant's identity as the individual who shot Rodgers during the Willingboro burglary. The court ruled that the State could introduce evidence relating to the burglary of Amaro Food Enterprises (Amaro Foods) in North Bergen, which occurred the night before the Willingboro burglary, during which a nine millimeter Sig Sauer handgun was stolen and later used to shoot Rodgers during the Willingboro burglary. The court also allowed the State to introduce evidence relating to a February 3, 2005 eluding incident in Paramus, during which the gun stolen from Amaro Foods and used in the Willingboro burglary was discarded from a vehicle being pursued by police, in which defendant was a passenger. The court later denied defendant's motion for reconsideration of these rulings.

> As a result of the court's rulings, the following facts were adduced at defendant's second trial.

Here, the Appellate Division, in a footnote, noted that Petitioner's first trial, held in September 2011, ended a in hung jury.

During the night of October 12, 2004, Amaro Foods was burglarized. The wires to the alarm system had been cut, alarm boxes were removed from the side of the building, the main office was ransacked, a rifle, two shotguns, and a nine millimeter Sig Sauer handgun were stolen, along with $5000 to $7000 in cash. No DNA or viable fingerprints were recovered from the scene.

The following night, at about 11:15 p.m., Rodgers was dispatched to the Willingboro United Check Cashing store to investigate an activated alarm. Upon arrival, Rodgers exited his vehicle and walked to the rear of the store, where he observed the rear door had been pried upward from the bottom, "like a can of sardines," and a pallet was positioned perpendicular to the wall. He was sure someone had broken into the business, but was unsure whether they remained inside. He contacted his dispatcher for additional officers, drew his weapon, and began backing out of the alleyway. As he reached the corner of the building gunshots were fired at him, with one hitting him in the leg, a second bouncing off the wall and hitting him in the back of the hand, and a third bouncing off the wall and hitting him in his vest. "After that there [were] about six or seven more shots that were fired and [Rodgers] could feel they were hitting the wall that [he] was standing next to because [he] could feel the mortar . . . bouncing off the wall and hitting [him]."

Rodgers could not see who was firing at him, and he had no idea where the shots were coming from. He called into the dispatcher that he was being fired at and had been hit, and then took cover behind a bush. He heard several more shots fired, but they sounded as though they were coming from further away than the initial barrage. When back-up officers arrived, Rodgers was taken to the hospital and treated for his injuries.

An employee from the check cashing store testified approximately $629 had been taken from a drawer, the telephone lines and wiring to three security cameras had been cut, the control panel to the alarm system had been pulled off the wall, and the siren was on the ground smashed. In the store, police found a pry bar, an acetylene

torch and tank, and a walkie-talkie, which did not belong to the business. Along a trail running from the back of a strip mall into the woods, police found nine millimeter bullets, six spent cartridge cases, and a bag containing wire cutters and the stolen money. However, they did not recover any fingerprints or DNA.

Approximately four months later, on February 3, 2005, Paramus Police Officer Brian McGovern stopped and spoke to Nunez-Torres, who was standing alone at 1:00 a.m., outside a furniture store on Route 4, in a "high crime area, [with] lots of commercial burglaries." Nunez-Torres, who appeared nervous, stated that he was waiting for his brother, who had left him there to get something to eat at a nearby restaurant. However, when McGovern spoke to the restaurant manager, she reported that the restaurant had no patrons in the last two hours. McGovern then "checked . . . for any outstanding warrants, any criminal history," with "negative results," so he "cut [Nunez-Torres] loose" and continued his patrol.

Shortly thereafter, McGovern observed a truck driving in an erratic fashion along Route 4. He initiated a traffic stop, but when he approached the vehicle on foot, the driver made an abrupt U-turn and drove off. As McGovern pursued the truck along Paramus Road, he observed multiple items being thrown out of the passenger side window. Later investigation resulted in the recovery from alongside the roadway of "burglary tools, in particular crow bars, two-way radios," bolt cutters, and screwdrivers, as well as a handgun.

At the direction of his dispatcher, McGovern ended his pursuit on the New Jersey Turnpike. Shortly afterward, Bergen County Police Officer Leshik Lorenc, who was on duty with his assigned K-9 and had been involved in the pursuit, observed that the truck crashed near a New Jersey Turnpike exit. A motorist flagged down the officer and indicated that people had run into the swamps adjacent to the highway. Lorenc deployed his dog, and he and other officers began tracking the truck's three occupants. Eventually, the officers came upon defendant and Mariano Nunez and placed them under arrest. Leonardo Jiminez

10

was arrested a distance away, in a hotel parking lot. The three were held in Bergen County Jail until they were released on bail.

Subsequent investigation of the handgun recovered from the side of Paramus Road revealed that it was the gun that had been stolen from Amaro Foods and used to shoot Officer Rodgers during the Willingboro burglary. Accordingly, in September 2005, Nunez was arrested and brought to Burlington County. At that time, he told the police about his involvement in the Amaro Foods and Willingboro burglaries, and how the gun was discarded during the police pursuit in Paramus. He also identified the other burglary participants.

Nunez testified at defendant's trial pursuant to a plea agreement under which he was to receive a ten-year sentence, with an eighty-five percent period of parole ineligibility. Nunez testified that in 2004, in addition to his construction business, he engaged in burglaries of commercial establishments, using his knowledge of alarm systems and his access to power tools. All of Nunez's burglaries proceeded in "the same way." Specifically: he chose businesses located away from residential areas, along roadways that would prevent the police from trapping him; the total number of people he brought with him would depend upon the size and type of business targeted; participants were assigned roles, with some serving as lookouts and getaway drivers, and others breaking into and removing items from the business; and participants would communicate with each other using walkie-talkies or cell phones. Nunez's role was to plan the burglaries, disable the alarm systems, and use an acetylene torch to crack any safes.

Nunez became friends with defendant when, after meeting him at a barber shop in Jersey City, he brought defendant into his burglary ring. He admitted to planning the Amaro Foods and Willingboro burglaries, and stated defendant participated in both. The prosecutor asked whether defendant also participated in an "attempted commercial burglary at a store" in Paramus, and Nunez said yes.

With respect to the Amaro Foods burglary, Nunez stated he followed his normal procedures. The day of the burglary, he went to the business and asked for a job application, so that he could see the layout of the business, where the alarm and office were located. On the night of the burglary, he went to the business with defendant, Nunez-Torres, Dilone, and "another individual." Nunez-Torres and Dilone served as the lookouts. Nunez cut the alarm and he, defendant, and the other individual climbed onto the roof, broke a window, and entered an adjacent business. They then broke into Amaro Foods by prying open a steel door. They stole money from a drawer, and also stole two shotguns, a rifle, and a nine millimeter handgun. Nunez found the handgun, but stated defendant took it for himself, and the group divided up the money and other weapons.

Regarding the Willingboro burglary, Nunez stated he planned it with Nunez-Torres and defendant during a trip to Philadelphia. He liked the location because there were no houses around, and there was a lake in the back, which would make it hard for the police to catch them if anything went wrong.

The burglary was executed by Nunez, Nunez-Torres, defendant, Jiminez, Dilone, and Acevedo. Dilone and Nunez-Torres served as lookouts, while the others broke into the business. The group brought with them walkie-talkies, flashlights, crowbars, wire strips to cut wires, and an acetylene torch and tanks; and defendant brought the gun he had taken from Amaro Foods. Nunez disabled the outside alarms and cameras, and the group waited a while to see if the police would respond. When no one came, Nunez, Jiminez, and Acevedo peeled up the back door, with Acevedo breaking off the lock. Nunez, defendant, Jiminez, and Acevedo entered the building. Nunez cut more wires, while Jiminez retrieved the acetylene tanks. Nunez found a safe bolted to the floor, and as he began breaking into it he heard three or four gunshots. At the time, Jiminez and Acevedo were inside the building with Nunez, while defendant was outside.

As soon as he heard the gunshots, Nunez ran out of the store, where he observed a police car, and defendant in the bushes, reloading the gun. Nunez asked defendant what he had done, and defendant responded, "if I didn't shoot him you all was gonna get caught inside there." Nunez then grabbed defendant, and the group ran toward the lake, swam across, and were picked up by Nunez-Torres on the other side. During the getaway, Nunez repeatedly asked defendant why he had shot his gun, and defendant repeatedly stated that if he had not shot the officer they all would have gone to jail, to which Nunez responded "you should have let them lock us up." According to Nunez, it was as if defendant was "in some kind of trance, like he's not himself," and he did not push the issue because he was worried defendant might shoot him as well.

Nunez had subsequent conversations with defendant, in which they expressed their shared belief that defendant had killed the officer. Nevertheless, according to Nunez, defendant continued to carry the gun.

Four months later, in February 2005, Nunez planned to burglarize a Nextel store located on Route 4 in Paramus, along with Nunez-Torres, defendant, and Jiminez. The men followed "the same procedures" as with the other burglaries, with Nunez-Torres acting as the lookout from a nearby restaurant.

According to Nunez, the planned burglary was "a mess" from the beginning due to snowy conditions, and it ultimately was aborted because Nunez-Torres reported that police were in the area. Things went from bad to worse when, as Nunez drove to pick up Nunez-Torres, he was pulled over by a police officer. Nunez did not cooperate with the stop, and drove off, with defendant in the front passenger seat and Jiminez in the back.

During the pursuit, defendant threw burglary tools out of the window, including crowbars and walkie-talkies. Pressing Nunez to address the gun, the prosecutor asked, "at some point while the officers were chasing you, did the gun come out?", and Nunez responded "Yes." The prosecutor next asked, "And what was done with the

13

gun?" to which Nunez began his answer, "Well, when the cop was close to us [defendant] pulled the gun, cock[ed] it —." At that point, the prosecutor interrupted and asked whether defendant had thrown the gun out of the window and Nunez, responded "Yes."

Continuing to elude the police on the New Jersey Turnpike, Nunez swerved off the road and into a fence, where the truck engine died. He and defendant then ran off into the swamp and were apprehended.

After their arrests, Nunez and defendant were taken to the Bergen County Jail, where they had daily discussions about what would happen if police found the gun. After they were bailed out of jail, defendant told Nunez that he was leaving for the Dominican Republic "because they gonna match that gun and they gonna know I killed a cop."

On cross-examination, Nunez admitted having once said that Dilone had a gun on the night of the Willingboro burglary. However, he explained on re-direct that Dilone only had a BB gun, while it was defendant who had the nine millimeter. Nunez also admitted he told police his fingerprints might be on the gun. And when the police suggested that he might have been the shooter, stating to him, "there's no reason why anybody else should say that you shot the cop," his response was "they got to prove it," rather than a flat denial.

Defendant was not arrested in connection with the Willingboro burglary until November 2008. He was found in the Dominican Republic, where he had obtained a Dominican driver's license, union card, bank card in the name of Kelvin Maria Martinez, and was working as a bus driver.

The Dominican officer who arrested defendant testified that he advised defendant of his rights, the reason for his arrest, and that, as they drove to the police station, defendant stated that he "had to" fire a gun, but he "had not injured anyone" and no one had died. Defendant also

expressed that he was afraid to come back to New Jersey, but knew he would be arrested eventually.

Defendant testified on his own behalf, denying any involvement in the Amaro Foods and Willingboro burglaries, or in any attempted burglary in Paramus. He also denied any friendship with Nunez, but stated he sometimes worked for Nunez's construction business, which is what he was doing on February 3, 2005. That day he worked on a construction job in Jersey City, which continued until about 10:00 p.m., and afterward he agreed to travel with Nunez to drop Jiminez at his home in the Bronx. During their trip, Nunez dropped his cellphone and was swerving on the road as he reached down to pick it up. After the police pursued Nunez, he refused to cooperate, explaining to defendant that his driver's license was suspended and he had no insurance.

Defendant denied any knowledge as to why Nunez-Torres was standing outside the restaurant in Paramus that night. He also denied throwing anything from the vehicle during the pursuit, and stated he did not see anything being thrown. As for why he ran from the police when the truck crashed, he explained that he feared he would be shot. He also denied anything improper in his return to the Dominican Republic. Defendant had never been arrested in the United States "not even a ticket, not even a parking ticket," so he did not understand that after making bail he was not allowed to travel. He stated that in March or April 2005, he traveled to the Dominican Republic because his father was hospitalized, and he remained in that country without returning to the United States because he wanted to help his father, as his mother and oldest sister had died in November 2004. He also had six children in the Dominican Republic, but he admitted leaving four small children in the United States.

Upon his arrest in the Dominican Republic, he did not contest extradition. He denied he was advised of the charges against him, or that he told the Dominican officer that he had shot someone. He believed Nunez implicated him in the shooting due to jealousy over his involvement with a woman Nunez had once dated, claiming Nunez

had warned him that he was "going to pay one way or another."

On this evidence, the jury found defendant guilty of conspiracy to commit burglary (count one), armed burglary (count three), armed robbery (count four), attempted murder (count six), aggravated assault (count seven), and theft by unlawful taking (count nine). On February 2, 2012, the court merged the armed robbery and aggravated assault convictions (counts four and seven) into the attempted murder conviction (count six) and sentenced defendant to twenty years, subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7. The court merged the conspiracy and theft by unlawful taking convictions (counts one and nine) into the burglary conviction (count three), and sentenced defendant to a consecutive term of ten years, also subject to NERA. The court also ordered defendant to serve a period of parole supervision after his incarceration.

[I]n issuing its sentencing decision, the court referenced the Amaro Foods burglary, and the attempted burglary of the store in Paramus, and also cited the fact that defendant had shot at police officers during the Paramus eluding incident. In particular, in finding aggravating factor one, the court noted:

> the willingness of [defendant] to shoot at police officers as evidenced by the Willingboro incident and the subsequent incident in North Jersey. The Court notes here that the subsequent shootings in North Jersey were not evidential in this case before the jury. Pursuant to the Evidence Rule 404, they were removed and redacted from the video that was shown to the jury. Nonetheless, the Court is aware that there were videotaped recordings of the shooting.

Similarly, in finding aggravating factor three, the court cited "the subsequent burglary and the subsequent shooting at police officers," along with "the sophistication of the burglary group with which the defendant was

16

involved." Finally, in finding aggravating factor nine, the court concluded defendant had "been undeterred by his experience in Willingboro [as] confirmed . . . by his conduct in Paramus."

At the sentencing hearing, defendant presented letters and an affidavit from Acevedo, in which Acevedo stated defendant was not guilty, and he had been pressured by detectives to implicate defendant in the crimes. The court declined to consider the documents, stating that they should be presented on post-conviction relief (PCR).

(Dkt. No. 17-13 at 2-19) (footnotes omitted).

## III.    ANALYSIS OF THE AMENDED PETITION

### A.    Ground Two of the Petition

Because the Court determines that habeas relief must be granted on Ground Two of the amended habeas petition, it begins its analysis here. For sake of completeness, after discussing Ground Two, the Court will address the remaining grounds for relief.

In Ground two of his amended habeas petition, Petitioner asserts that his trial counsel was ineffective by failing to object to prejudicial trial testimony regarding a previous burglary of Amaro Foods (the "Amaro Foods Burglary" or "North Bergen Burglary"), another attempted burglary of a cell phone store (the "Nextel Burglary") and a police chase (the "Paramus Eluding Incident") which were not the subject of Petitioner's trial. (Dkt. No. 4 at 95.) In support of his claim, Petitioner states:

The State's witness, Mr. Gerardo Perez testified about $5,000.00 proceeds [] taken from that robbery, multiple guns stolen and the resulting damage from that previous burglary, all unrelated to Petitioner's trial. (10T 34-17). There had been a previous 104 hearing and Petitioner and the State

understood that there would be testimony relating to one of the handguns stolen in that Amaro Robbery (10T 33-8-17). That handgun appeared to be the same gun involved in the matter that Petitioner's trial was predicated upon, but all other details regarding that robbery were irrelevant and simply prejudicial. Defense Counsel did not object. Nor did he request a limiting instruction requesting the testimony be considered for the limited purpose of establishing a gun, with a specific serial number was stolen on a particular date. There was similar irrelevant and highly prejudicial testimony from Cristine Klag [sic], a North Bergen Detective. She testified at length and in great detail about specific facts relating to the Amaro Food Store crime scene, that were completely unrelated to the matter Mr. Rosa was being tried. (10T 38-17 to 41-25; 46-13 to 49-15). Moreover, not only did Trial Counsel not object to this line of questioning, he also did not object to irrelevant, highly prejudicial photographs of the Amaro crime scene being published to the jury and moved into evidence. (10T 42-16 to 24). None of the testimony regarding the Amaro crime scene nor the photos were relevant to any issue in dispute. As for other crimes evidence, the only evidence relative was the recovery and identity of the gun. Trial Counsel was ineffective for not objecting to the admission of this evidence and failing to have it properly sanitized. Petitioner was unfairly prejudiced.

This inappropriate evidence continued with the testimony of codefendant Mariano Nunez who testified in great detail about irrelevant prejudicial matters ranging from details of not only the Amaro Burglary (10T 134-1 to 136-25, 136-21 to 139-19)[,] [b]ut he also testified in great detail about a Nextel cell phone burglary that Petitioner allegedly participated in with him (10T 160-18 to 24). After testifying in great detail about this unrelated matter, Trial Counsel only objected when the Prosecutor asked if Petitioner was one of the participants in that Nextel cell phone burglary. Trial Counsel should have objected to the entire line of questioning as nothing elicited was relevant to any issue in dispute in Petitioner's trial.(10T 160-18 to 24).

The Court sustained the objection "as to further elaboration on the burglary in Paramus", but Counsel did not appropriately request that the Court also instruct the jury on

18

the limited use that it could consider this other crime evidence
for. Nunez went on to testify in great detail about a high
speed chase in Bergen County that was also irrelevant and
highly prejudicial. This testimony was compounded with the
testimony of Officer Brian McGovern and Officer Leshik
Lorence who both testified in great detail as well regarding
the Bergen County police chase. (11T 65-22 to 69-17; 11T
69-18 to 72-24; 11T 84-19 to 95-25)[.] All of this extraneous
testimony should have been objected to as it was highly
prejudicial, irrelevant and beyond the scope of the Court's
N.J.R.E. 404(b) ruling where the Honorable John A. Almeida,
J.S.C, held a hearing on whether to admit other crime
evidence under New Jersey Rule of Evidence 404(b) and
ruled that "evidence of the theft of the gun in North Bergen
and the possession of that gun in North Bergen and the
possession of that same gun during the Paramus eluding may
be admitted during the trial in this case as probative of the
identity of the perpetrators in the Willingboro shooting. That
is certainly an issue in dispute" (2T 36-11 to 19). The detailed
testimony of all of these witnesses exceeded way beyond the
scope of that ruling, without objection of Trial Counsel.

Trial Counsel was clearly ineffective in standing by mute
allowing all of that irrelevant highly prejudicial testimony to
come in, without objection to Petitioner's detriment.
Petitioner seems to have had mini trials within his trial. **So
much irrelevant testimony was allowed regarding all of
those other criminal acts, without objection by Trial
Counsel, that the jury was misled and subject to
confusion. It's hard to separate these crimes, especially as
the facts were presented without a limiting instruction,
and it was impossible for the jury to focus on the crimes
that Petitioner was being tried for. Petitioner was
ultimately on trial for those alleged prior bad acts (the
Amaro Burglary, Nextel Burglary, and the events
regarding the chase in Bergen County ) that were
admitted without objection, beyond the scope of the 104
ruling and without a limiting instruction. There was no
way for the fact finder to distinguish between those prior
bad acts and the crime for which the trial was premised.
Without objections and limiting instructions, there was no
roadmap for the jury to follow. Thus, Petitioner's jury
was confused and misled. As a result, Petitioner did not**

**get a fair trial. Trial Counsel was ineffective and
Petitioner was prejudiced.**

(Dkt. No. 9 at 95-97) (alterations added) (emphasis added).

Respondents oppose relief on Ground Two. (Dkt. No. 17 at 61-74.) The State filed

a motion to admit prior crimes evidence regarding the Amaro Food Store burglary and

the Paramus Eluding Incident. (Dkt. No. 18-4 at 5.) In the first trial, Judge Almeida held

an N.J.R.E. 404(b) hearing regarding admissibility of this evidence. (Dkt. No. 18-4.)

Judge Almeida found that evidence of the gun used in the burglaries and the police chase

was probative of the identity of the perpetrators in the Willingboro shooting for which

Petitioner stood trial (the "United Check Cashing Burglary") and outweighed any

prejudice.  (Dkt. No. 18-5.)   In other words, evidence that the ballistics from the charged

crime matched the same gun used in the Amaro Foods Burglary and the Paramus Eluding

Incident could be used as 404(b) evidence of identity of the perpetrator of the United

Check Cashing Burglary.  After the first trial resulted in a mistrial, and the 404(b)

argument was again presented to the court, the second trial judge, Judge Delehey, agreed

with Judge Almeida's ruling.

Generally, Respondents rely upon the Appellate Division's ruling that Petitioner

was not prejudiced by admission of this evidence because other evidence of Petitioner's

guilt was strong, and the testimony about the Amaro Foods Burglary was not extensive

nor did it portray Petitioner as dangerous. (Dkt. No. 17 at 68-74.) The Appellate Division

further found that the Paramus Eluding Incident was not prejudicial because it only added

to the idea that Petitioner was part of a burglary ring.  Respondents contend that because

the evidence was properly admitted, subject to two limiting instructions, defense counsel's performance was not deficient, and Petitioner did not establish prejudice under the second prong of the *Strickland* test, as the PCR court held, which was affirmed by the Appellate Division without discussion.

### 1. Legal Analysis

The Court turns to a detailed analysis as to whether defense counsel's failure to object to the admission of prejudicial prior crimes testimony or to take necessary steps, such as limiting instructions or proper jury charges, was unreasonable under prevailing professional norms, as Petitioner contends.  If so, but for such errors, was there a reasonable likelihood that the outcome of the trial would have been different? From this Court's exhaustive review of the voluminous record, it is clear the admission of the extensive testimony surrounding the Amaro Foods Burglary and the Paramus Eluding Incident was erroneous and highly prejudicial. The Court agrees with Petitioner that, essentially, he was put on trial for three, perhaps four (including the Nextel burglary), separate crimes, and the evidence the State presented, along with argument, makes that very clear. As set forth below, the State improperly offered evidence of the Amaro Foods Burglary and the Paramus Eluding Incident to convince the jury that these crimes were so similar that they could infer the same person committed the other crimes and the charged crime. This went well beyond the purported purpose of the evidence, which was to establish identity of the person in the charged crime. And although it was error for the jury to hear such evidence, this Court cannot sit as a reviewing court. *Estelle v. McGuire*, 502 U.S. 62, 67 (1991) (whether evidence was incorrectly admitted under state law "is no

part of a federal court's habeas review of a state conviction.... a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States.")  But as detailed below, this Court finds that counsel was required, under prevailing professional norms, to do more to ensure that defendant received a fair trial, and failure to do so deprived Petitioner of effective assistance of counsel.

The *Strickland* test for ineffective assistance of counsel in violation of the Sixth Amendment right to counsel has two parts, deficient performance, and prejudice.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  Deficient performance requires "showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment."  *Id.* at 687.  Counsel's performance is evaluated under an objective standard of reasonableness, under prevailing professional norms.  *Id.* at 688. Prevailing professional norms include the ABA Standards for Criminal Justice "and the like."  *Strickland*, 466 U.S. at 688.  "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"  *Id.* at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). In *Buehl*, the Third Circuit addressed whether defense counsel's failure to request a limiting instruction with respect to certain "other crimes" evidence, constituted ineffective assistance of counsel.  *Buehl v.Vaughn*, 166 F.3d 163,169 (3d Cir. 1999). It held:

> When evidence of a defendant's other crimes is introduced to show identity, there is "sometimes ... a substantial danger of unfair prejudice" because the jury may consider the evidence as proof of

> bad character or propensity to commit the crime charged. *United States v. Murray*, 103 F.3d 310, 316 (3d Cir.1997), *cert. denied*, 525 U.S. 911, 119 S.Ct. 254, 142 L.Ed.2d 209 (1998). To alleviate this risk, counsel may request a cautionary instruction. *See generally Lesko v. Owens*, 881 F.2d 44, 55 (3d Cir.1989), *cert. denied*, 493 U.S. 1036, 110 S.Ct. 759, 107 L.Ed.2d 775 (1990). In some circumstances, such an instruction may be strongly advisable; in others, counsel may reasonably conclude that it is strategically preferable to omit such a request since the instruction might have the undesired effect of highlighting the other crimes evidence.

*Buehl*, 166 F.3d at 170.

Prejudice requires a "showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies[,]" "or even to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697.

### a. Judge Almeida's 404(b) Ruling; Mistrial

Petitioner's claim begins with Judge Almeida's pretrial Rule 404(b) ruling. New Jersey Rule of Evidence 404(b) ("Rule 404(b)") provides:

> (b) Other Crimes, Wrongs, or Acts.

> (1) Prohibited Uses. Except as otherwise provided by Rule 608(b), evidence of other crimes, wrongs, or acts is not admissible to prove a person's disposition in order to show

23

that on a particular occasion the person acted in
conformity with such disposition.

(2) Permitted Uses. This evidence may be admitted for other
purposes, such as proof of motive, opportunity, intent,
preparation, plan, knowledge, identity, or absence of
mistake or accident when such matters are relevant to a
material issue in dispute.

(3) Character and Character Trait in Issue. Evidence of a
person's character or character trait is admissible when that
character or trait is an element of a claim or defense.

On March 17, 2010, before Petitioner's first trial, Judge Almeida held a Rule

404(b) hearing regarding the Amaro Foods Burglary and the Paramus Eluding Incident.

He ruled as follows, with the most relevant portions emphasized:

> I do understand that 404(b) evidence has quote, a unique
> tendency to turn a jury against the defendant. Because of that
> unique tendency the admission of other crimes evidence must
> be handled cautiously, State versus Reddish, R-E-D-D-I-S-H,
> 181 New Jersey 553, 608, 2004. There are characteristics of
> other crime evidence that requires a careful and pragmatic
> evaluation by the trial court based upon the specific factual
> context in which the evidence is offered to determine whether
> the probative worth of the evidence outweighs its potential for
> undue prejudice. State versus Cofield, 127 New Jersey 328, at
> page 334, a 1992 case. As Mr. Fury maintains, New Jersey
> Rule of Evidence 404(b) is a rule of exclusion rather than a
> rule of inclusion.  State versus Darby, 174 New Jersey 509 at
> page 520, 2002. No one in this case disputes the nature of the
> factors that the Court has to consider. State versus Cofield,
> previously cited, establishes the four part test. Number one,
> that the evidence of the other crime must be admissible as to a
> material issue in the case.  Number two, they must be similar
> in kind and reasonably close in time to the offense charged.
> Number three, the evidence of the other crime must be clear
> and convincing. And, number four, the probative value of the
> evidence must not be [out]weighed its apparent prejudice.
> That's Cofield previously cited page 338.

The evidence of the theft of the gun in North Bergen[2] and the possession of that same gun during the Paramus eluding may be admitted during the trial in this case as probative of the identity of the perpetrators in the Willingboro shooting. Number one, the first factor. This evidence is relevant to a material issue that is genuinely in dispute, that is, the identity of the perpetrators. That is certainly a material issue in dispute.

Evidence from both the North Bergen burglary and the Paramus eluding are relevant to establishing that Messieurs Jimenez and Rosa were participants in the Willingboro matter. The fact that the gun that was stolen from Amaro Foods was used the very next night to shoot the officer in Willingboro and then possessed again during the Paramus eluding depicted on the MVR shown yesterday in court three months later, an incident, the Paramus incident in which both Jimenez and Rosa were unquestionably involved given their arrests as they fled the suspect vehicle in the Meadowlands swamp in North Jersey are relevant to establishing that they participated in the United Check Cashing incident. There is no other substantial proof to establish identity. Other than the testimony of the cooperating codefendants whose credibility will be severely attacked at trial given their 10 year, 85 percent plea agreements, there is no other substantial corroborating evidence to establish identity other than the gun.

Proof of the defendant's use or possession of a handgun in one crime can be used to establish the identity of the person or persons who committed another crime with the same handgun. Kindly look at, counsel, State v. H-A-R-D-A-W-A-Y, 296 New Jersey Super 627 at pages 629 to 630, an Appellate Division 1994 case. In that case, the Court permitted the use of the same gun in an armed robbery that was used in a homicide two and a half weeks later to prove that the defendant was at least at the scene of the homicide.

The use and possession of the same gun in three distinct matters is not only relevant but it's probative as to the issue of

---

[2] This Court refers to the "North Bergen Burglary" as the Amaro Foods Burglary, and the "Willingboro incident" as the United Check Cashing Burglary.

the perpetrators' identity. I am cognizant of defense counsel's argument that Mr. Jimenez was not present during the North Bergen burglary and that will be addressed when I talk about methods of sanitizing the evidence. I'm also mindful of the State's proper use of the unreported Appellate Division opinion State versus Gillespie, 2009 WL 2496683, an Appellate Division August 18th, 2009, case, a reported opinion -- unreported opinion, I'm sorry -- that is very closely on point to the case before this Court.

The second prong of Cofield requires that the other crimes be similar in kind and reasonably close in time to the matter being tried. State versus Cofield at page 338. I'm mindful of State versus Barden, found at 195 New Jersey 375, a case cited by the State in which it discusses the second prong of the test. It says on page 389 in Barden, our Supreme Court, quote, Recently we noted that the second prong may be eliminated where it serves no beneficial purpose, citation omitted. We explained that the usefulness of the Cofield second prong as a requirement is limited to cases that replicate the circumstances in Cofield, in which evidence of drug possession that occurred subsequent to the drug incident that was the subject of a prosecution was relevant to prove possession of the drugs in the charged offense. Thus, in Williams, where the other crimes evidence was relevant only to defendant's state of mind and other similar instances the test became a three part test by elimination of the similar in kind prong.

<u>In this case, the similarity of the North Bergen incident, the Paramus incident, and the Willingboro incident is not the reason for seeking admission of this evidence. Rather, it is the weapon, the identity of the weapon.</u> The North Bergen burglary occurred one day prior to the Willingboro shooting. The Paramus eluding occurred less than four months later. It does seem to me that while this second prong is not critical, it is, these incidents did occur reasonably close in time. The crimes are not similar in nature as I concede but that element seems to have been minimized by Justice Wallace who I believe wrote -- yes, Justice Wallace wrote State versus Barden, in an opinion concurred with by the majority of our court.

Factor number three, that there's clear and convincing evidence to establish that the defendants were involved, clearly involved in the Paramus matters, clearly were involved in the Willingboro matters and a least Mr. Rosa was involved in the Bergen matter, North Bergen matter. The burden of proof is clear and convincing evidence and that burden rests with the State of New Jersey. State versus Hernandez, 170 New Jersey 106, at pages 119 and again at page 127, a 2001 case. The proof must be by direct evidence, not hearsay evidence. State versus Ingenito, 87 New Jersey 204, 1991.

Yesterday we listened to seven witnesses. The witnesses' testimony were overwhelming that these incidents occurred, the North Bergen incident occurred, in which Mr. Rosa was a participant, the Paramus incident occurred, in which both Mr. Rosa and Mr. Jimenez were participants, and the Willingboro shooting occurred in which Mr. Jimenez, Mr. Rosa among others, of course, were involved. The evidence and of course the evidence is one sided, we have not heard the defense case at trial and a jury ultimately will decide the factual circumstances but there is no doubt based upon the factual presentation made yesterday that the State has met its burden as to prong number three.

There of course is prejudice to both Mr. Rosa and Mr. Jimenez by the admission of this evidence, particularly as it relates to Mr. Jimenez and the North Bergen incident. However, there are ways of minimizing, sanitizing that particular impact particularly on Mr. Jimenez. The witness who testified about the North Bergen incident and the involvement of the individuals in the North Bergen incident was clear mentioning at least three times during examination that Mr. Jimenez was not involved. It's my intention at the conclusion of this oral opinion to provide counsel with copies of the other crimes evidence charge. I intend on directing counsel specific acts that may not be mentioned and may not be testified to during the trial of this case and I'm going to urge counsel to draft a charge, meeting with each other prior to the trial to draft a charge that will minimize the prejudice or eliminate the prejudice as to Mr. Jimenez as it relates to the North Bergen incident with which he wasn't involved and sanitizing the aspects that I'm going to direct be taken out.

The probative value of this evidence is substantial. Identity of the gun is critical in establishing how Officer Rodgers, who shot Officer Rodgers on the date involved in the Willingboro burglary and that outweighs any of the prejudice that -- substantially outweighs any of the prejudice that might be involved here. I direct the parties to look at State versus Hardaway previously cited by the Court which is a murder case in which evidence similar to this nature was used in a sanitized way without a problem according to that Court.

<u>The testimony relating to Mr. Rosa's intention to shoot Officer McGovern immediately after the stop that occurred on February 3rd, 2005, may not be introduced in any way. Mr. Nunez's testimony in that regard must not, **will not be permitted and a mistrial will be caused if that testimony comes out. The prejudice to Mr. Rosa with the admission of that testimony is immense and it is not relevant to the weapons identity in this case.**</u>

There shall also be no testimony relating to gunshots that occurred purportedly during the Paramus eluding. I listened to the MVR several times yesterday on the record and I could not hear the gunshots. The officer himself McGovern couldn't testify that gunshots occurred but, more importantly, the prejudice inherent in that testimony would be substantial and would in my view outweigh the probative value of that testimony.

Finally, any testimony relating to Mr. Jimenez in North Bergen would not be permitted since it is clear he was not involved in the North Bergen burglary. The jury charge should be sanitized and modified in the appropriate section to make it clear to the jury not only is the propensity evidence not to be considered but Mr. Jiminez's involvement in North Bergen is not seriously questioned.  He was not involved. That is my view of the application of the State. I'm going to hand to counsel the proof of other crimes, wrongs, or acts evidence and ask that counsel look at it and make changes prior to our trial.

(Dkt. No. 18-5 at 3-12) (emphasis added).

### b. Second Trial; Improper Opening; Failure to Object

Petitioner's first trial resulted in a hung jury in September 2011.  Petitioner's second trial began in December 2011.  From the very beginning of the trial, the prosecutor exceeded the scope of Judge Almeida's 404(b) ruling in his opening statement. The prosecutor first advised the jury of its duty to decide whether defendant burglarized the United Check Cashing Store in Willingboro, New Jersey on October 14, 2004, and whether he shot Officer Richard Rodgers during that burglary. (Dkt. No. 18-12 at 5-7.)  He described to the jury testimony they would hear from the investigating officers, that they could not find any trace of evidence that would lead them to a suspect, no fingerprints, no DNA, no clues. But then the prosecutor went beyond Judge Almeida's ruling. Although, as set forth *supra*, Judge Almeida had ruled that "[i]n this case, the similarity of the North Bergen incident, the Paramus incident, and the Willingboro incident is <u>not</u> the reason for seeking admission of this evidence [but rather] it is the weapon, the identity of the weapon," the prosecutor contravened the Court's cautionary instruction.

The prosecutor stated:

> Let's start at the beginning, October 13, 2004, North Bergen Township. Police are dispatched, **much like here**, to a location in the town, Amaro foods.  Amaro Foods is a beef distributorship, long time business in the township. North Bergen police arrive, there is a report from the owner that the business had been broken into. **Much like they did down here in United Check Cashing**, the scene is secured, the scene is searched outside. They find an alarm box ripped off the wall. They find all the cables, telephone cables, electrical wires to the building cut and severed. They find a door or window on the second story open, pried open. Inside the

facility, they find a metal security door pried back, pried open, missing from inside, several thousand dollars in cash, four or $5,000 in cash, and four weapons, four weapons, of them, I ask that you recall this and pay particular attention to this a Sig-Sauer nine-millimeter handgun. A Sig-Sauer nine-millimeter handgun was taken from that business. Those guns were owned and possessed and registered lawfully to the owner of that business, Gerry Perez. **But much like here, no suspects. There is no DNA. There is no fingerprints. Again, just vanished into thin air.**

(Dkt. No. 18-12 at 7-8.)

Counsel did not object to these prejudicial statements and seek a curative instruction. It should have been clear to defense counsel, at this point, that the prosecutor intended to offer evidence of the details of the Amaro Foods Store burglary, not only to show the identity of the gun, but to suggest—improperly— Petitioner was involved in a sophisticated burglary ring whose participants could be identified by their "signature" crimes.  Judge Almeida had ruled that this is not a case of "signature crimes" because the crimes do not have unique features that are nearly identical.  Here, only Petitioner's possession of the gun at Amaro Foods Store, and in the vehicle where the gun was thrown out the window in the Paramus Eluding Incident were admissible for identity. The jury was prejudiced at the outset by the State's forecasting of prior crimes for an improper purpose during opening statements, yet counsel did not object.

The prejudice only got worse. The prosecutor then began to discuss, in great detail, the February 3, 2005, Paramus Eluding Incident, including the dramatic evidence, all of which occurred after the gun was thrown out of the vehicle, where the occupants of the vehicle escaped on foot into an icy swamp, where they were tracked by a K-9 officer,

pulled out of the swamp by helicopter, and required treatment for hypothermia, all of which suggests the dangerousness of the situation the police officers involved in the eluding incident were subjected to. (Dkt. No. 18-12 at 9-10.) As explained below, defense counsel did not object to the prejudicial statements to the jury nor seek a proper limiting instruction.

### c. The State's First Witness; Failure to Object

The State's first witness was Gerry Perez, co-owner of Amaro Foods.  Like the opening statement by the State, Perez's testimony exceeded the scope of the 404(b) ruling.  He testified, without objection or a request for a limiting instruction by defense counsel, about the $5,000 cash and missing <u>guns</u>, other than the gun linked to the Willingboro burglary, and the damage to his property from the burglary of Amaro Foods. (Dkt. No. 18-12 at 17-21.)

### d. The State's Second Witness; Failure to Object

The State's second witness, Christine Klag, a detective for the North Bergen Police Department, similarly testified beyond the scope of the 404(b) ruling.  She testified, in great detail, about the Amaro Food Store crime scene.  Photographs of the crime scene were published to the jury and moved into evidence, while Klag described a broken fence, steps leading to the roof and a broken window where entry was gained, cut electrical and phone lines, the spot on the wall where the alarm had been removed, and the pry marks on the door leading to the warehouse. (Dkt. No. 18-12 at 23-26.)  Defense counsel did not object or request a limiting instruction that the jury may not consider the

evidence of a prior burglary as evidence of Petitioner's propensity to commit similar burglaries. (Dkt. No. 18-12 at 21-27.)

The State then introduced evidence of the United Check Cashing Store crime scene in Willingboro through the testimony of Officer Richard Rodgers (Dkt. No. 18-12 at 28-38), Michael Fields, an employee of United Check Cashing Store, (Dkt. No. 18-12 at 38-47), and Detective William McDowell, who investigated the crime scene (Dkt. No. 18-12 at 48-59.)

### e.   The State's Cooperating Witness; Failure to Object

The State's sixth witness was Mariano Nunez.  (Dkt. No. 18-12 at 59-102; Dkt. No. 18-13 at 5-33.)  He testified, without objection or request for a limiting instruction, about details of the Amaro Foods Burglary, including how he "cased the joint," how he and his accomplices gained entrance, the accomplices' assigned roles in the burglary, who did what once they were inside, how much money they stole and "divvied up," and that they took four weapons, including a Sig Sauer nine-millimeter. (Dkt. No. 18-12 at 69-72.)

After Nunez testified about the United Check Cashing Burglary and shooting, he testified, without objection or a request for a limiting instruction, that on February 3, 2005, he went with his brother and Petitioner to case a Nextel cell phone store for a burglary later that night ("Attempted Nextel Burglary") (Dkt. No. 18-12 at 81-82.) The prosecutor asked Nunez, "how did you set that job up, the same as the others?" and Nunez responded, "Yes, the same procedures. (*Id.* at 82.)  Defense counsel objected, for the first time, when the prosecutor asked Nunez "who was going to go in the [Nextel]

store, the rest of you?" After his objection was overruled, he quickly objected again. (Dkt. No. 18-12 at 83.) In a sidebar, defense counsel argued that planning the Nextel burglary had nothing to do with the identification of the weapon used in the Willingboro shooting, and it was beyond the scope of the 404(b) ruling. (Dkt. No. 18-12 at 83.) He raised his concern that Nunez was going to testify, not only that Petitioner was present in the vehicle and threw a gun out the window, but that when an officer pulled their vehicle over that day, Petitioner had a gun and was going to shoot the officer. (*Id.* at 84.) Defense counsel also advised that he intended to object when the prosecutor brings in a police officer to testify about the details of the car chase after the gun was thrown out the window.  (*Id.*) He discussed the need to "sanitize[] the eluding incident." (*Id.* at 86.) The prosecutor, unwittingly, argued "**Judge, if that were the case, the Amaro Foods incident would never be before this jury either. It's the same incident, just after.**" (*Id.* at 86.) The trial court sustained the objection, noting it had Judge Almeida's ruling in front of him, and stated:

> to say that a gun was thrown out the window of a car while the police were engaged in a chase is one thing. Setting the background and explaining that it was Rosa who had the gun places the gun in Rosa's hand. Why did he have the gun? Well, because he was engaged in another commercial burglary. The doesn't help the defendant's case.

> On the other hand, it does an awful lot to identify Mr. Rosa as the possessor of the gun.

> At the last trial, evidence was introduced that Mr. Rosa had the gun during the Paramus burglary attempt at the Nextel store. The same evidence is presented here.

> All that has happened here that the Court recalls that is different is that Mr. Nunez has testified in greater detail about how the burglary was mapped out or the considerations for the burglary. The defense objects to that. And in a broad sense the Court thinks that the objection has some merit. There isn't any reason for the jury to understand all of the details of the burglary. All that it need know is that Mr. Rosa participated in the attempted burglary in Paramus, that he possessed the gun, and that a police chase ensued. During that police chase the gun was arguably thrown from the car in which Mr. Rosa was a passenger. That, of course, is based on circumstantial evidence.
>
> The Court is aware from the first trial that a pursuing police officer will testify that items were being thrown from a vehicle in which Mr. Rosa was a passenger. The items could not be identified as they were thrown out the window but they were picked up on the side of the road later, essentially, they constituted burglary tools. The one item that was not recovered was the gun. It should be noted that there was snow on the ground, and that in all probability, the gun was hidden by the snow. In any event, it was discovered a few days later by a high school student.
>
> With all that as background, it strikes the Court that there is no need for the jury to hear further details of the Paramus attempted burglary, other than those which are necessary to place the gun in Mr. Rosa's hand.

(Dkt. No. 18-12 at 86-87.)  Defense counsel did not request a limiting instruction to undo the harm caused by the jury already having heard details of the Amaro Foods Burglary, far beyond the scope that Petitioner was present and took the same nine-millimeter gun used in the United Check Cashing Burglary. Defense counsel did not seek an immediate limiting instruction to undo the harm when the jury heard about Petitioner planning the Nextel burglary, testimony that should have been "sanitized" by limiting it to Petitioner's alleged possession of the gun during the police chase. As defense counsel stated in his

initial objection, "testimony about planning the Nextel burglary had nothing to do with the identification of the weapon used in the Willingboro shooting[;]" "they could have been up there on a picnic. They could have been up there watching a ballgame." (Dkt. No. 18-12 at 83-84.) Although the trial court had expressed its belief that planning the Nextel burglary was permissible to show why Petitioner had a gun (*Id.* at 86); defense counsel did not seek a proper limiting instruction, one that instructed the jury it could not consider evidence of the attempted Nextel Burglary to determine that Petitioner had a propensity to commit burglaries.

Without further objection or request for a limiting instruction, Nunez went on to testify to extraneous, prejudicial material about the Paramus police chase.  In fact, the first question the prosecutor posed to Nunez after the sidebar began "Mr. Nunez, we left off talking about the Nextel burglary." (Dkt. No. 18-12 at 88.) Nunez testified that he was in the Nextel building when his brother called to warn him that he saw police in the area. (*Id.* at 89.) He testified that he aborted the robbery, got in his truck, and picked up Rosa and Jiminez. (*Id.*) He soon noticed a police car following him, but he thought the police had taken a ramp in other direction but then the police car pulled up behind him with the lights on. (*Id.* at 90.)  Nunez testified that he briefly pulled over, but when the officer got out of his car to approach Nunez in his vehicle, he took off again. (*Id.*) The prosecutor asked Nunez if he had any burglar tools in the vehicle. (*Id.*) Nunez responded in the affirmative and described the tools. (*Id.* at 90-91.) Nunez then testified that Rosa had a gun, and that it was the same gun "used to shoot the officer down here." (*Id.* at 91.) Nunez testified that Rosa started throwing the burglary tools out the window. (*Id.* at 92.)

#### f.      A Mistrial Should Have Been Declared

At this point, the State had admitted evidence that Rosa was in the car during the police chase, and he had the same gun used in the Willingboro shooting. But the prosecutor asked "[n]ow at some point, when the officers were chasing you did that gun come out?" (Dkt. No. 18-12 at 92.) Nunez responded, "Yes." (*Id.*) And the prosecutor asked, "and what was done with the gun?" (*Id.*) Nunez testified "[well], when the cop was close to us **Rosa pulled the gun, cock it**" and the prosecutor interrupted, asking "did he throw the gun?" (*Id.*) Although the prosecutor veered away from this topic, at no time did defense counsel object. Yet, Judge Almeida had been clear that such testimony, no matter how fleeting was so prejudicial that if it were to come before the jury a mistrial would result.  As Judge Almeida stated, "testimony relating to Mr. Rosa's intention to shoot Officer McGovern immediately after the stop that occurred on February 3rd, 2005 … may not be introduced in any way. ... will not be permitted and <u>a mistrial will be caused if that testimony comes out. The prejudice to Mr. Rosa with the admission of that testimony is immense and it is not relevant to the weapons identity in this case.</u>"  (emphasis added).  Defense counsel, however, never requested a mistrial based on admission of this statement. Given Judge Almeida's ruling, it is likely a mistrial would have been granted. Indeed, the immense prejudice to Petitioner required it.[3]

Nunez further testified in detail about what occurred after the gun was thrown out the window. Defense counsel objected as soon as Nunez testified that he crashed the

---

[3] Although the Appellate Division ruled the defense counsel's decision not to object was a strategic decision, it is hard to find that failure to seek a mistrial was strategic.

truck during the Paramus Eluding Incident. (Dkt. No. 18-12 at 92.) The prosecutor

responded,

> not only is it relevant, Judge, <u>the charge pertains to this type
> of activity.</u> He fled from these officers once he disposed of
> that gun. He ran like hell to get away from that gun. <u>It's more
> than relevant to his motive, state of mind, possession of that
> gun.</u>

(Dkt. No. 18-12 at 92.) The trial court ruled,

> the Court has previously ruled on this at the first trial. The
> Court is going to allow it. It believes that it does go to a
> showing that the defendant was aware of the seriousness of
> the matter of which he was involved and it explains in some
> measure his concern that he might be tied to a crime that
> involved a gun. The Court is going to allow it. The Court
> believes it's absolutely in accordance with Judge Almeida's
> ruling.

(*Id.* at 94.)  Whether the ruling was correct or not, Defense counsel did not request a

limiting instruction that such evidence was admitted for a limited purpose (beyond

identity) such as motive or state of mind argued by the prosecutor. Left with the court's

ruling and no limiting instruction, Nunez further testified at length about the dramatic

details of their attempt to escape by running into a swamp in winter, their apprehension

with use of a K-9, airlift by helicopter, and treatment for hypothermia before they are

booked at the police station. (*Id.* at 94-95.)

At the end of Nunez's testimony, defense counsel made an objection which

pertained to the next witnesses to be called by the State,

> in case there wasn't a ruling on this exact issue, I wanted to
> make clear that I was objecting to testimony from police
> officers regarding the eluding incident once there was the car
> crash, particularly the very vivid description the officer gave

> of the chase through the swamp, the helicopter, how freezing
> cold it was and that sort of thing. The whole eluding issue
> was introduced in order to ascertain the identity of the gun,
> but once the gun is thrown out the window, that really should
> be the end of it.

(Dkt. No. 18-13 at 33-34.) The trial court stated "as far as the Court's concerned, one, the

gun is involved. It's been tied to the auto chase, and it can be tied to the defendant's flight

and his motive for flight and its connection ultimately to the crime in Willingboro." (*Id.*

at 34.) The prosecutor argued "They came in previously, they came in during the 404(b)

hearing before Judge Almeida, and I believe it's entirely appropriate to consciousness of

guilt, flight and so forth." (Dkt. No. 18-13 at 34.) To which the trial court responded "All

right. That's the Court's ruling." (Dkt. No. 18-13 at 34.)  Again, whether the ruling was

correct or not, Defense counsel did not ask for a limiting instruction on the 404(b)

evidence or the flight/consciousness of guilt ruling.

### g.     Dramatic Testimony; Failure to Object

Against the backdrop of no limiting instructions to the jury, the State presented the

evidence of the Paramus Eluding Incident as if Petitioner were on trial for that crime.  No

reasonable jurist could conclude that the extensive testimony introduced by the State

went to the issue of who possessed the gun to which the ballistics involved in the charged

crime matched.  The State called Officer Leshik Lorenc of the Bergen County Police

Department. (*Id.* at 44.) He was a K-9 officer on duty in Bergen County on February 3,

2005. (*Id.*) He gave dramatic testimony about pursuing the vehicle until it was outside his

jurisdiction and coming upon the crashed vehicle after he turned around to return to his

jurisdiction. He got out of his car and ran toward the crashed vehicle, and a motorist

indicated that someone had run into the swamp. He had a K-9 dog with him and prepared

the dog to track into the swamps. The prosecutor asked him to set the scene, which

Officer McGovern did. He described the icy creek he crossed with "General" the dog,

and how he heard the ice cracking beneath his feet. He described other officers trying to

cross the creek but falling through the ice. By the time they reached the parking lot of a

commercial building, he was informed that the Secaucus police had arrested a suspect.

He testified about using the K-9 dog to track the two other people who were at large.

When they failed to find anything, they returned to the crashed vehicle, where they saw,

in another direction, a break in a fence with footprints heading down an embankment to

another icy creek. They crossed the creek into heavy vegetation in the main part of the

swamps,

> and plung[ed] into some sort of void and the snow just broke
> beneath us and our feet were wet, there was water up to our
> knees, and then there was empty space and we were almost
> level with our waist for the snow level. So we tried to crawl
> out. We again kept breaking through this snow. Wasn't able
> to support our weight. Finally we crawled out far enough
> where we got into thicker area of the swamps, there was more
> vegetation, I was able to hold our ground so we continued
> tracking south for a few hundred yards. When I say south,
> there was no landmarks or anything I could reference my
> direction. It just appears that I was going south away from the
> ramp and at one point after several hundred yards the track
> turn[s] west. We came upon like a creek but it wasn't icy,
> there was water, still water in the creek. We followed that
> creek cause it was easier to walk through the water than it
> was the surrounding mounds and areas of the swamps and we
> came upon this open area. It was surrounded by cattails, it
> was a large body of water, and there was a little bit of land,
> clear land there, snow covered land and that's when we came
> upon the other two suspects. … They were ordered to get on
> the ground. When they failed to comply, the other officer

went after Mariano Nunez, brought him to the ground. As he's getting him, Mariano Nunez is put to the ground, Rosa -- the officer does after Rosa, Nunez now begins to lift himself off the ground, that's when he's apprehended by my partner, the police dog. … I handcuffed Mariano Nunez, the officer that was with me during all the stumbling around in the swamps lost his pair of handcuffs so Kelvin Rosa was not handcuffed so we discussed how we were going to get out and we determined that the best way was the same way which we came in which was approximately 500 yards into the swamps. As we were walking them out of the swamps, we had to go through that ice or watery creek. Mariano Nunez handcuffed couldn't keep his balance, kept falling into the swamps. I had to keep lifting him up. We walked a few feet further the same thing happened. It became very exhaust[ing] and slow paced. So we returned back to the same area where we apprehended them to see if there's a better way. New Jersey state police helicopter was in the area at the time so we communicated with our headquarters which communicated to the helicopter to see if there's a shorter way to get back to the ramp. With their spotlight we asked them to indicate the closest way and they basically pointed that same way we came in. So we tried to make a second attempt to exit the swamps. Same thing happened, ended up being where my body just gave out. I couldn't lift Nunez anymore. The other officer had to actually pick him up out of the water so we returned back to the scene and we were looking for other options to get out now. … The state police helicopter made an attempt to hover above the open body of water. I walked, I tried to walk through the water with the dog to get to the helicopter but as I got closer the wind of the helicopter was getting difficult to breathe with the cold air and the water was getting deeper so soon I retreated back. Now the helicopter's getting low on fuel so headquarters notified us they were going to try NYPD aviation to come out there. … They came out, they circled around us once they hovered in literally within like 10 feet, 15 feet away from us. While they're coming in, the cold air was so bad, it like froze your lungs. You became paralyzed. Knowing being out there for a couple hours, I knew this was the only way out but I almost literally told them to go away because it was that cold from the wind of the helicopter. Eventually we just pushed forward, they were able to lift in the two suspects, I got in, my partner got

> in, and the other officer got in. … Mariano Nunez was treated
> for the dog bite and both were treated for I believe
> hypothermia. … We were also treated at the hospital, myself
> and the other officer [prosecutor] "for hypothermia?" Yes.

(Dkt. No. 18-13 at 44-49.)

Although this extraneous testimony clearly had little to do with who possessed the

gun, defense counsel did not seek an immediate limiting instruction after the testimony,

even when the State argued the testimony went to the issue of intent or motive.

Just before the State called Officer John D'Amato from the Paramus Police

Department to testify about finding the gun on the side of the road in Paramus, the trial

court gave the first limiting instruction on the 404(b) evidence. The record does not

indicate whether the instruction was given at the request of defense counsel. The trial

court instructed:

> Ladies and gentlemen, during the course of the trial, the State
> has introduced evidence concerning burglaries or attempted
> burglaries of Amaro Foods in North Bergen and I think a
> Nextel store in Paramus. Normally, such evidence is not
> permitted under our rules of court. Our rules specifically
> exclude evidence that a defendant committed another crime
> or another wrong because it has the tendency to suggest that
> because a person may have done something wrong in the past
> they are, therefore, guilty of the present offense. However,
> our rules do permit the introduction such testimony for
> limited purposes. Here it has been allowed for the very
> limited purpose of permitting the State to demonstrate or
> attempt to prove possession of the handgun involved and the
> identity of the person who possessed it. You may not use that
> evidence to decide that Mr. Rosa, if you find that he
> possessed or that he was involved at Amaro Foods or at the
> Nextel Store that he's, therefore, guilty of the present offense.
> Now it's a fine line but it's a fair line. We simply don't find
> people guilty because of their prior wrongs and the Court has
> permitted evidence of the Amaro burglary and the Nextel

> burglary for the limited purpose of allowing the State[4] to
> attempt to prove possession of the weapon and the identity of
> the person who possessed it. At the conclusion of the trial
> when the Court instructs you, it will give you a limiting jury
> instruction in a little more detail.

(Dkt. No. 18-13 at 55-56). This instruction went only to the issue of the identity of the

person who possessed the gun and not to the other issues identified by the State, such as

motive or intent. It is hard to find that allowing a full-blown recitation of the Amaro Food

Burglary and the Paramus Eluding Incident could go solely to the issue of Petitioner's

identity as to the one who possessed the gun in the United Check Cashing Burglary. More

proper instructions were required to carefully instruct the jury, and counsel failed to raise

these issues.

The State rested after calling the Dominican Republic Police Officer who arrested

Petitioner for extradition years after the eluding incident. (Dkt. No. 18-14 at 5-30.) The

parties then entered the following stipulation:

> On October 14, 2004 members of the Burlington County
> prosecutor's office processed the crime scene located at
> United Check Cashing in Willingboro. During processing
> detectives recovered two discharged nine-millimeter bullets
> and six discharged nine-millimeter bullet shells from the
> grounds in the rear of the building. On February 7, 2005 a
> detective of the Paramus police department recovered a Sig,
> that's S-I-G, Sauer nine-millimeter handgun on the side of
> Paramus road. That item has been introduced into evidence as
> Exhibit S-12.
> The Sig Sauer nine-millimeter handgun recovered in Paramus
> along with the discharged bullets and shells recovered in

---

[4] As the Court noted earlier, the Appellate Division found harmless error because the
testimony went to consciousness of guilt. Without a proper limiting instruction, however
consciousness of guilt as to the Paramus Eluding Incident is precisely what Rule 404(b)
precludes.

Willingboro were submitted to the New Jersey State Police
ballistics laboratory for forensic analysis. Upon analysis
Detective Sergeant James Ryan, a qualified expert in the field
of firearm and toolmark examination determined that the
bullets and shells recovered from the scene of the United
Check Cashing Store in Willingboro were discharged from
the Sig Sauer nine-millimeter handgun found on Paramus
Road.

(Dkt. No. 18-15 at 31.) The State rested.

### h.   Defendant's Testimony

Petitioner testified in his own defense, summarized as follows.  (Dkt. No. 18-15 at
3-30.) He met Nunez while he was working at a meat market in Jersey City. Nunez's
father shopped there, and he introduced them because they were all from the Dominican
Republic. Later, Nunez asked Petitioner whether he wanted to work for Nunez's
construction company on his days off his meat market job. He denied any other
involvement with Nunez.  He was not involved or even present during the Amaro Foods
and Willingboro burglaries, and he knew nothing about a plan to burglarize those
businesses. He left for the Dominican Republic on November 7, 2004, because his
mother and sister were killed in an accident. He stayed for two months and returned
around the end of December.

On the day he was arrested with Nunez after eluding police, Petitioner testified he
was working on a construction job with Nunez in someone's basement, and Nunez kept
asking him to go to New York after work to see someone named Leonardo who lived in
the Bronx. Petitioner agreed. On the way, they were pulled over by a police car for
swerving. Nunez was driving, and he started swerving when he dropped his cellphone

between the gear shift and was trying to get it out. Nunez took off driving "like a crazy man" when the officer approached.  Nunez told Petitioner his driver's license was suspended and his insurance was fake. No one threw anything out of the vehicle. Petitioner ran, after Nunez crashed the vehicle, because, in the Dominican Republic, if you elude police in a car chase, they have orders to shoot. He thought he was going to be shot, so he ran.

He made bail after his arrest. He went back to the Dominican Republic when his father became ill and was hospitalized. When Officer Serrano arrested Petitioner in the Dominican Republic, he told Petitioner he was being arrested for extradition but not what the charges were. Petitioner testified he did not say anything to any of the Dominican Republic police officers about a gun or a shooting.  He agreed to extradition because he thought it was only for eluding, and he did not have any reason to run from that charge. Fighting extradition could have resulted in him spending years in a Dominican Republic prison.

Petitioner believed Nunez framed him out of jealousy. Two weeks after the eluding incident, Nunez caught Petitioner with a woman whom Nunez was dating. The woman broke up with Nunez then and there, and Nunez told Petitioner he was going to pay for it.

Of course, Petitioner was thoroughly cross-examined on his testimony. In particular, the prosecutor asked Petitioner if he was charged with unlawful possession of a weapon after the eluding incident. This led to defense counsel seeking a mistrial at the close of trial:

Mr. Rizzo: … I'd like to make an application and the application is this, it's either for a mistrial which I think is appropriate and called for or at the very least an instruction to the jury and it's based on part of the cross-examination of my client. Mr. Westfall was asking my client about the Paramus charge of unlawful possession of a weapon. That was a charge that wasn't firsthand information that Mr. Nunez, for example, was giving during the course of the eluding to establish possession of the gun, I had it back at Willingboro and I think it's highly prejudicial to my client that it was brought out he was charged in Paramus with unlawful possession of a gun. I don't know how to what extent a curative instruction can purge that from the minds of the jury. That's why I'm asking for a mistrial.

THE COURT:  I think just give me one moment and then I'll hear from Mr. Westfall.  Well, Mr. Rosa did say on direct examination that he never heard of the charges until he was told about them I think at Kennedy airport, JFK.

MR. RIZZO: That's the charges regarding Willingboro.

THE COURT: Well, Mr. Westfall, I'll hear from you.

MR. WESTFALL: Judge, I'll be very brief. My understanding is like the Court's, I recall Mr. Rosa testifying he never was charged with anything out of Paramus. In fact if I recall his testimony correctly he thought once he bailed out that was the end of the matter.  He just went on his way. He was clearly charged. I think it was appropriate for cross-examination, particularly considering the 404(b) evidence that was admitted in this case. His possession of that gun during the eluding stands to reason that he was charged. Couple that with what he testified to, I think that was within the bounds of fair cross-examination.

THE COURT: The Court does recall him saying that once he made bail, he thought the matter was over. They are not his exact words but very close to what he said. The Court considers the questions asked by Mr. Westfall to have been fair and within the scope of the direct examination.  The Court denies the motion for a mistrial.

(Dkt. No. 18-15 at 31.)

### i.      THE PCR Court's Application of *Strickland* Was Objectively Unreasonable

Before Petitioner sought habeas review before this Court, he brought this ineffective assistance of counsel claim in his first PCR proceeding. The Appellate Division, on PCR appeal, affirmed the denial of this claim "substantially for the reasons set forth by Judge Cook in his thorough written decision." (Dkt. No. 17-35 at 10-11.) Thus, for habeas review, this Court turns to the PCR court's determination of this claim. In his opinion of February 27, 2018, after discussing the ineffective assistance of counsel standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), Judge Cook held:

> Petitioner's primary contention is that trial counsel failed to object to irrelevant and highly prejudicial testimony from several witnesses related to the Amaro Food Store burglary and the Paramus eluding incident. Petitioner argues Perez, Klag and Nunez's testimony was irrelevant, highly prejudicial and otherwise beyond the scope of identification, as permitted under Judge Alameida's 404(b) ruling.
>
> Petitioner asserts the State's witness, Mr. Perez, the owner of Amaro Food Store, was allowed to testify about stolen firearms and money, which was unrelated to Petitioner's trial. North Bergen Detective, Christine Klag,[5] was allowed to testify as to the specific facts of the Amaro Food Store burglary, which, like the gun, was unrelated to the Willingboro shooting Petitioner was on trial for. Further, Klag was allowed to introduced [sic] photographs of the Amaro Food Store burglary. Petitioner asserts Mariano Nunez's testimony was also very detailed about the Amaro Food Store burglary as well as the Paramus eluding incident.

---

[5] In the state court transcripts, the witness, Christine Klag, in alternately referred to and "Klaq" and "Klag." According to her trial testimony, the correct spelling is "Klag." Therefore, the Court has replaced the misspellings throughout the transcript citations.

Petitioner contends the details about the Amaro Food Store Burglary w[ere] prejudicial and made him look dangerous in front of the jury. Petitioner asserts trial counsel was ineffective because he failed to object to the details of the Amaro Food Store and the Paramus incidents, even after the previous 404(b) hearing.

Further, Petitioner argues trial counsel did not request that the other crimes testimony be considered only for the limited purpose to establish identity. At a minimum, petitioner asserts the court should have issued a limiting instruction to the jury regarding use of such testimony.

The record shows, however, that trial counsel acted objectively reasonably and his performance did not prejudice Petitioner. Moreover, Petitioner failed to prove trial counsel's failure to object to the State's witnesses, testimony, and introduction of evidence was prejudicial.

Petitioner's claim that trial counsel failed to object to the Amaro Food Store burglary evidence is unfounded. Petitioner's trial counsel filed a motion regarding the Amaro Food Store burglary and Paramus eluding incident. Judge Almeida held an NJRE 404(b) hearing regarding admissibility of this evidence. Judge Almeida admitted those two incidents and found the probative value of the gun and burglaries to identify the perpetrators in the Willingboro shooting outweighed any prejudice. Judge Almeida held the evidence was both relevant and probative.

More importantly, the Appellate Division already determined that Petitioner was not prejudiced by the introduction of such evidence. The Appellate Division held the evidence of Petitioner's guilt was strong and the testimony about the Amaro Food Store burglary was not extensive nor did it portray Petitioner as dangerous. The Appellate Division further stated the Paramus eluding incident was not prejudicial because it only added to the idea Petitioner was part of a burglary ring.

This Court is limited in its ability to grant a petition for Post-conviction relief to:  (1) a denial of a Petitioner's constitutional rights, (2) a Court's lack of jurisdiction and (3)

an imposition of a sentence not in accordance of law. Neither of these factors apply to the matter before the Court. This Court cannot act as an appellate court for Petitioner to have his claims re-heard. The Appellate Court made its determination that the evidence introduced at trial was not prejudicial.

Further, the State is permitted to introduce evidence of other crimes to show "motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident ... " under N.J.R.E. 404(b) and State v. Cofield, 127 N.J. 328, 338 (1992). Such evidence is admissible if it: (1) is relevant to a material issue which is genuinely disputed; (2) be similar in kind and reasonably close in time to the offense charged; (3) be proven by clear and convincing evidence; and (4) have probative value not outweighed by prejudice. Id. Judge Almeida properly found that the State satisfied the elements under Cofield and that the evidence was relevant to the issue of identity.

Petitioner's argument regarding the failure to give a limiting instruction also fails. The record shows Judge Delehey instructed the jury to use the evidence for identification purposes only. Judge Delehey emphasized that the jury was not to use the Amaro Food Store burglary and Paramus eluding incident evidence to decide whether Petitioner has a tendency to commit other crimes or to find him guilty of the other incidents. The Appellate Division also noted that Judge Delehey's final instructions, which limited the nature of the evidence, made it clear for the jury to understand what the evidence should be used for.

(Dkt. No. 17-26 at 14-17) (emphasis added).

### j.  The PCR Court Failed to Determine Whether Counsel's Performance Was Based on Reasonable Professional Judgment under Prevailing Professional Norms

The PCR court's determination that "trial counsel acted objectively reasonably" is

an unreasonable application of the *Strickland* deficient performance prong of the

ineffective assistance of counsel claim.  Here, the question is whether counsel's decision

48

not to object to admission of evidence outside the scope of Judge Almeida's 404(b) ruling, and not to seek an immediate limiting instruction once such evidence came in, was based on counsel's reasonable professional judgment. See Wiggins, 539 U.S. at 524 (*Strickland's* deficient performance prong requires consideration of the prevailing profession norms that prevailed at that time and place.)

The PCR court held that counsel's performance was not deficient because he challenged the admission of 404(b) evidence in a pretrial hearing before Judge Almeida. The PCR court's determination, however, involved an objectively unreasonable application of the *Strickland* deficient performance prong. Under New Jersey State law, the prevailing professional norm suggests that counsel seek, not only an immediate limiting instruction upon admission of 404(b) evidence, but also a carefully crafted limiting instruction.  Clearly, as discussed above, much of the trial went far beyond the narrow issue of the identity of the person who possessed the gun without such instruction.

Counsel should have been aware of the dictates of the New Jersey Supreme Court case, *State v. Gillispie*, 208 N.J. 59 ( 2011) ("*Gillispie II*").  Judge Almeida cited the Appellate Division's 2009 opinion in *Gillispie* ("*Gillispie I*") in his 404(b) ruling, noting the case was similar to Petitioner's case. But the New Jersey Supreme Court reversed *Gillispie I* in August 2011, before Petitioner's second trial in December 2011. Familiarity with the New Jersey Supreme Court's decision would have alerted defense counsel to object to details of the Amaro Foods Burglary and Paramus Eluding Incident, and all mention of the Nextel attempted burglary.  Further, based on *Gillispie II* and the cases cited therein, even if the trial court overruled the objection, prevailing professional norms

suggested defense counsel should have requested immediate limiting instructions when 404(b) evidence was introduced concerning the other crimes, which this Court has identified in its discussion of the trial transcript above.

In *Gillispie II*, the New Jersey Supreme Court addressed the issue of identity in the context of a signature crime versus the identity of a gun used in more than one crime:

> To determine whether other-crimes evidence shall be admitted on the issue of identity, we said:
>
> > [T]he prior criminal activity with which defendant is identified must be so nearly identical in method as to earmark the crime as defendant's handiwork. The conduct in question must be unusual and distinctive so as to be like a signature, and there must be proof of sufficient facts in both crimes to establish an unusual pattern.
>
> [State v. Fortin, 162 N.J. 517, 532, 745 A.2d 509 (2000) (citing State v. Reldan, *supra*, 185 N.J.Super. at 502, 449 A.2d 1317.) ]
>
> Fortin must be understood in context and does not preclude admission of the gun to link the murder weapon to defendants in this case. In fact, Fortin cited to a passage from Cofield that noted, "the distinctive features of a silver pistol used in a prior crime would be admissible under [former] Evidence Rule 55 [now N.J.R.E. 404(b) ] in an unrelated murder trial to establish either the identity of the perpetrator or the weapon used." Fortin, *supra*, 162 N.J. at 529, 745 A.2d 509 (quoting Cofield, *supra*, 127 N.J. at 336, 605 A.2d 230). That is precisely the purpose for which the evidence relating to the use of the gun in the barbershop shootings is admissible in this case; indeed, the ballistics findings matching the gun to both crimes is even more compelling than the "silver pistol" example in Cofield.
>
> Where a signature crime is alleged, circumstantial evidence is key, and the unique common features among the crimes must

be nearly identical. But that is not the case where, as here, an object can be linked directly to the defendant for purposes of identification. Therefore, "an object associating the defendant with the crime" is admissible to prove identity. Weinstein on Evidence ¶ 404[15], "Character Used for Proper Purposes: Relevancy of Other Crime to Issue Other than Propensity; Identity" n. 6 (citing United States v. Covelli, 738 F.2d 847, 855–56 (7th Cir.), cert. denied, 469 U.S. 867, 105 S.Ct. 211, 83 L.Ed.2d 141 (1984) (prior possession of small caliber weapon admissible as probative of possession of murder weapon and ultimate identification of defendant); United States v. Two Eagle, 633 F.2d 93 (8th Cir.1980) (observation of defendant in stolen car admissible as to identity of defendant who fled from crime scene in victim's vehicle)). The fact that ballistics testing revealed that the gun used in the Bronx barbershop shooting was the same as the gun used in the Barnegat murders is highly relevant to the disputed material issue of identity given the evidence linking defendants to the Bronx barbershop shooting. Accordingly, because we are not dealing with a "signature crime," we agree with the Appellate Division's holding under the first prong.

This Court has recently noted "that the second prong [of Cofield ] may be eliminated where it serves no beneficial purpose." Barden, *supra*, 195 N.J. at 389, 949 A.2d 820 (citing State v. Williams, 190 N.J. 114, 131, 919 A.2d 90 (2007)). The usefulness of the second prong "as a requirement is limited to cases that replicate the circumstances in Cofield, in which evidence of drug possession that occurred subsequent to the drug incident that was the subject of the prosecution was relevant to prove possession of the drugs in the charged offense." Barden, *supr*a, 195 N.J. at 389, 949 A.2d 820 (internal quotations omitted). The Appellate Division stated that since the other-crimes evidence here dealt with defendants' connection with the gun and not the similarity of the crimes, the second prong is irrelevant for the purposes of this case, and we agree.

*State v. Gillispie*, 208 N.J. 59, 88–89, 26 A.3d 397, 413–15 (2011) (alterations in original).

There was no reason that the detailed and extensive extremely prejudicial evidence relating to the Amora Foods Burglary, the Paramus Eluding Incident, and the Nextel Burglary should have been before the jury, but once the court allowed it, limiting instructions were critical.

Indeed, in the first trial, the parties entered a stipulation that established the identity of the same gun in the Amaro Foods Burglary, the Willingboro Burglary, and the Paramus Eluding Incident. The only facts not stipulated to were Petitioner's presence with the gun during each of those incidents. This Court cannot imagine any reasonable strategic basis not to make the trial court aware of the parties' stipulation before the second trial. With the stipulation before the court from the outset, it would have been far easier to persuade the trial court, based on counsel's knowledge of the testimony from the first trial, that the only admissible 404(b) evidence was Nunez's testimony that Petitioner was with him during the Amaro Foods Burglary and he took the Sig Sauer nine-millimeter gun, that Petitioner was a passenger in Nunez's car four months later when Nunez eluded a traffic stop, and that Petitioner threw the same Sig Sauer nine-millimeter out the window. This would have permitted the trial court to sanitize the evidence before it was too late, as happened here.

*Gillispie II* guides defense counsel on the need for an immediate limiting instruction, even repeated limiting instructions, when 404(b) evidence is admitted.

> We take this occasion to remind litigants and trial judges that other-crimes evidence must be appropriately sanitized. See Hardaway, *supra*, 269 N.J.Super. at 631, 636 A.2d 128. Independently, we also emphasize the importance of a firm

and clear jury instruction when dealing with other-crimes evidence:

> [B]ecause the inherently prejudicial nature of such evidence casts doubt on a jury's ability to follow even the most precise limiting instruction, the court's instruction should be formulated carefully to explain precisely the permitted and prohibited purposes of the evidence, with sufficient reference to the factual context of the case to enable the jury to comprehend and appreciate the fine distinction to which it is required to adhere. [Cofield, *supr*a, 127 N.J. at 340–41, 605 A.2d 230 (citing Stevens, *supr*a, 115 N.J. at 309, 558 A.2d 833).]

Thus, a trial court must "explain to the jury the limited purpose for which the other-crimes evidence is being offered." Fortin, *supra*, 162 N.J. at 534, 745 A.2d 509. Further, "a court should not state generally the content of N.J.R.E. 404(b), but should 'state specifically the purposes for which the evidence may be considered and, to the extent necessary for the jury's understanding, the issues on which such evidence is not to be considered.'" Ibid. (quoting Stevens, supra, 115 N.J. at 309, 558 A.2d 833). The instructions should be timely given both when the evidence is admitted and in the final charge. Id. at 534–35, 745 A.2d 509.

In the present case, because of its ruling the trial court gave a general instruction that encompassed identification, motive, and plan. Instead, the trial court should have instructed that the evidence regarding the barbershop robbery (including evidence of a shooting which led to the police possession of the cartridge casings—but limited to its essentials) be considered only for the limited purpose of tying the murder weapon to Gillispie and his accomplice—in other words, only for the issue of identity and not to bolster Mercer's credibility or as propensity evidence.

*Gillispie II*, 208 N.J. at 92–93, 26 A.3d at 415-17.

*Gillispie II* was not followed here. Some of the most prejudicial evidence was Officer Lorenc's testimony about chasing Nunez and Petitioner through the icy swamps in February 2005, to the point where Lorenc was paralyzed with cold and exhaustion and wanted to give up on the helicopter rescue, despite it being the only means, perhaps, of saving them all from hypothermia. Petitioner was not the driver of the vehicle when it led the police on a chase, and he was not charged in this chase for eluding. In fact, in response to defense counsel's 404(b) objection, the prosecutor argued this evidence was offered to show Petitioner's consciousness of guilt, why he ran into the swamps after Nunez crashed the vehicle. Yet, defense counsel did not ask the trial court to instruct the jury that it could not use this evidence to find Petitioner's guilt of the crime of eluding as propensity evidence.

Limiting 404(b) evidence was crucial to Petitioner's defense, where the State relied, almost exclusively, on uncorroborated accomplice testimony from Nunez. Based on *Gillispie II*, and the cases cited therein, prevailing professional norms required defense counsel to object when the prosecutor elicited testimony throughout much of the trial to show the similarity of three burglary crimes- Amaro Foods, United Check Cashing, and attempted burglary of Nextel. Here, defense counsel objected far too late to overcome the prejudice.

Defense counsel sought a mistrial because the State introduced evidence that Petitioner was charged with possession of a gun based on the eluding incident. The request for a mistrial was denied. It is inexplicable that defense counsel did not seek a mistrial, at the close of the case and outside the presence of the jury, because Nunez

testified that Petitioner cocked the gun when Officer McGovern came close to the vehicle during the eluding incident. Judge Almeida's ruling was very clear that such evidence was not to come in, and if it did, it would result in a mistrial. This was deficient performance by counsel.

### k. The PCR Court Failed to Apply the Correct Standard for Prejudice under *Strickland*

Next, the Court turns to the prejudice prong of *Strickland*. The PCR court's determination of the prejudice prong of *Strickland* was objectively unreasonable because it applied an incorrect standard. The correct question was not whether erroneous admission of unsanitized 404(b) evidence was harmless error, as the PCR court framed the issue, but whether there is reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to overcome confidence in the outcome. *Wiggins*, 539 U.S. at 534 (quoting *Strickland*, 466 U.S. at 694.)

First, if defense counsel had asked for a mistrial because Nunez testified Petitioner cocked his gun when Officer McGovern approached Nunez's car for a traffic stop, there is a reasonable probability the trial court would have granted the mistrial. When defense counsel raised objections, the trial court stated that it had Judge Almeida's ruling in front of him, and the trial court expressly based its rulings on its understanding of Judge Almeida's decision.  Judge Almeida warned the parties that any testimony of this nature would result in a mistrial. There was no room for misinterpretation of Judge Almeida's determination, testimony that Petitioner prepared to shoot Officer McGovern during the

traffic stop was so immensely prejudicial that no limiting instruction could cure the error and required a mistrial. For this reason alone, the PCR court's application of the *Strickland* prejudice prong was objectively unreasonable.

But the prejudice caused by counsel's objectively unreasonable errors is not limited to the failure to seek a mistrial based on one instance of improper admission of 404(b) evidence. If counsel had objected to all improper 404(b) testimony, and even if those objections were overruled, had he sought a limiting instruction when 404(b) evidence was permitted, there is a reasonable probability the jury would have followed those instructions. With each request for a limiting instruction, counsel had the opportunity to carefully tailor the instruction to remind the jury it could only consider the evidence to determine whether Petitioner possessed the gun at Amaro Foods (and for the other purposes the State offered such testimony as discussed above), and whether Petitioner threw the gun out the window in Paramus while eluding the police. If the jury was given a limiting instruction when the State introduced 404(b) evidence, which seems to have been much of the trial testimony, there was a reasonable probability the outcome of the trial would have been different. Stated differently, the jury was so prejudiced by hearing that Petitioner was part of a burglary ring, which burglarized Amaro Foods, United Check Cashing Store, and attempted to commit a burglary of a Nextel store, all in a similar manner, and that Petitioner was guilty of eluding after the failed Nextel burglary, that the jury could not focus solely on the evidence that Petitioner committed the United Check Cashing Burglary and shot Officer Rodgers. Apart from the stipulation and admissible 404(b) evidence to show identify of the gun, the jury had only the

testimony of Petitioner's accomplice, Nunez, and Officer Serrano's testimony that Petitioner mentioned a gun and a shooting when he was arrested in the Dominican Republic for extradition on the Willingboro charges. The PCR court's conclusion that this evidence, almost entirely uncorroborated testimony of an accomplice, was so strong that any trial error was harmless, is an objectively unreasonable determination.

Finally, if there were any doubt as to the prejudice prong, the erroneous jury charge leaves no doubt. During final instructions to the jury, the Court gave the following Rule 404(b) limiting instruction to which counsel did not object:[6]

> The State has introduced evidence that [defendant] participated in a commercial burglary of Amaro Foods in North Bergen on October 13, 2004. As you will recall, it is alleged that the handgun used to shoot Officer Richard Rodgers was stolen from the business. In addition, the State has introduced evidence that [defendant] was an occupant of a vehicle that was involved in a pursuit in Paramus on February 3, 2005. Again, it is alleged that the handgun stolen from Amaro Foods was discarded from the vehicle in which [defendant] was an occupant.
>
> Normally, such evidence is not permitted under our rules. Our rules specifically exclude evidence that a defendant has committed other crimes, or wrongs or acts when it is offered only to show that he had a disposition or a tendency to do wrong and, therefore, must be guilty of the charges before the [c]ourt. <u>Before you can give any weight to this evidence, you must be satisfied that the defendant committed the other **crime**, wrong or act.</u> If you are not so satisfied, you may not consider it for any purpose.
>
> Our rules do permit, however, evidence of other crimes, wrongs or acts when the evidence is used for a very specific and narrow purpose. In this case, evidence of both the North Bergen burglary and the Paramus attempted burglary and

---

[6] Indeed, it appears counsel drafted the charge with the agreement of the prosecutor.

> eluding have been admitted as to the issue of identity or possession of the gun.  That is, the evidence has been offered to suggest to you that [defendant] was involved in the Willingboro matter given the fact that the same gun used to shoot Officer Rodgers was allegedly in his possession in the North Bergen burglary and during the incident in Paramus.
>
> Whether this evidence does, in fact, assist you in determining the identity of those involved in the Willingboro matter is for you to decide. You may decide that the evidence does not assist you and is not helpful at all. In that case, you must disregard the evidence. On the other hand, you may find or decide that the evidence does assist you in determining the identity of the person who possessed the gun and use[] it for that specific purpose.
>
> You may not use this evidence to decide that [defendant] has a tendency to commit crimes or is a bad person. That is, you may not decide that just because the defendant allegedly committed other crimes, or wrongs, that he must be guilty of this charge. The [c]ourt has admitted the evidence only to assist you in determining the identity of the individuals involved in the Willingboro matter. You may not consider it for any other purpose and may not find the defendant guilty simply because the State has offered evidence that he committed another **crime** or wrong or act.

(Dkt. No. 18-16 at 10-11) (emphasis added).

First, contrary to *Gillespie II*, the Court essentially stated the language of

N.J.R.E. 404(b) and did not properly tailor the charge to the evidence.  Moreover, the

instruction focused improperly—by parroting the rule's formulaic language which the

New Jersey Supreme Court cautions against—on the commission of a *crime* as opposed

to the act of possessing the firearm that the State alleged was the same firearm used to

commit the crime charged in the indictment.  The charge improperly focused on the

commission of prior crimes:  "Before you can give any weight  to the evidence, you must

be satisfied that the defendant committed the other *crime*, wrong or act.  If you are not satisfied, you may not consider it for any other purpose. "And while the trial court referred to "act," the inclusion of the word crime caused prejudicial error.  This prejudice was compounded by a further, confusing charge that read:  "In this case evidence of both the North Bergen burglary and eluding [again, improperly referring to the crimes, not the possession of the gun] have been admitted as to the issue of identity or possession of the gun."  It was evidence of the possession of the gun only that the jury should have been instructed, and while it was in connection with the burglary and eluding, read in its entirety the charge improperly suggested to the jury that the jury must be satisfied that the defendant committed the other two **crimes**.  And although the trial court later instructed "you may not decide that just because the defendant allegedly committed other **crimes**, or wrongs, that he must be guilty of the charge," the court's earlier instruction to the jury that before it could consider such evidence it must be satisfied the defendant committed the other **crime** was confusing and prejudicial.

## 2.    Conclusion

In the Court's final analysis, Petitioner was prejudiced as soon as the prosecutor suggested in his opening statement that this was a case about burglaries so similar that Petitioner must have committed these signature crimes. The prejudice became worse when multiple witnesses described the Amaro Foods Burglary in such detail, the only purpose for which was to suggest the United Check Cashing Burglary must have been committed by the same people. The one topic that was strictly precluded by Judge Almeida's pretrial 404(b) ruling and predicted to result in a mistrial, came in and no

mistrial was requested. Even then, the prejudice worsened when the jury heard the dramatic story of the dangerous conditions under which the police officers apprehended Petitioner after the traffic stop. All without proper limiting instructions. When the final jury instruction was given, it only caused more confusion. In the end, counsel's deficient performance resulted in a trial where it was impossible for the jury to focus on the crimes that Petitioner was being tried for. Because of these errors, Petitioner was ultimately on trial for those alleged prior bad acts, and was denied a fair trial.

### B.   Ground One of the Petition

For sake of completeness, the Court will now address Petitioner's remaining grounds for relief. In his first ground for habeas relief, Petitioner asserts he was denied his right to confront a witness against him because he was unable to see the State's key witness, Mariano Nunez, during his trial testimony. (Dkt. No. 9 at 8.) Petitioner argues that throughout the duration of Nunez's testimony, his view of the witness was blocked by the assistant prosecutor, despite repeated requests to allow Petitioner a full view of the witness. (Dkt. No. 9 at 91-92.)

Respondents oppose relief on Ground One. (Dkt. No. 17 at 54-61.) The transcript of Nunez's testimony reflects that very early on, defense counsel requested a sidebar conference because the assistant prosecutor was blocking Petitioner's view of the witness. (Dkt. No. 18-12 at 62-63.) The prosecutor agreed to accommodate Petitioner. (*Id.* at 63.)  One moment later, defense counsel objected again because Petitioner could not see the witness. (*Id.*) The prosecutor apologized and shifted again. (*Id.*) Later, defense counsel objected again. (*Id.* at 78-79.)  The trial court

directed the prosecutor where to stand and Petitioner where to sit. (*Id.* at 79.)

Throughout the remainder of Nunez's testimony, Petitioner raised no further

objection. (Dkt. No. 18-12 at 79-102; Dkt. No. 18-13 at 4-33.) Petitioner's counsel

made a motion for a judgment of acquittal at the close of the State's case, based on

violation of the Confrontation Clause. (Dkt. No. 18-15 at 5.)

The trial judge denied Petitioner's motion, stating:

> Attorneys move around the court and from time to time
> Mr. Westfall blocked defendant's view of the witness
> stand. Asked to move, Mr. Westfall moved, and I think
> later returned to that position. The Court believes it was
> totally inadvertent. In any event, it didn't prevent the
> defendant from hearing the testimony and it didn't stop his
> attorney, Mr. Rizzo, from bringing it to the attention of
> the Court. The Court perceives absolutely no harm. It's
> trivia and it has nothing to do with a fair trial.

(Dkt. No. 18-15 at 6-7.)  Respondents argue that Petitioner has not pointed to any

case law that would suggest the Appellate Division's affirmance of the trial court was

an unreasonable interpretation of Supreme Court precedent.

## 1.    The highest reasoned state court decision

Petitioner has not presented a factually similar Supreme Court case.

Therefore, habeas review is whether the highest reasoned state court decision on this

issue involved an unreasonable application of clearly established Federal law.  The

highest reasoned state court decision was by the Appellate Division on direct appeal:

> [t]he record reflects that on several occasions during
> Nunez's testimony, the prosecutor stood in defendant's
> line of sight, making it difficult for defendant to observe
> the witness. Each time this occurred, defense counsel
> objected, and the prosecutor apologized and moved. The

court also permitted defendant to move his chair so he
could see the witness.

Defendant cites no authority holding that inadvertent,
short-lived obstructions of a defendant's line of sight,
which were corrected by the prosecutor and the court,
constitute a deprivation of a defendant's constitutional
right of confrontation. Defendant was permitted to see and
hear Nunez's testimony, and cross-examine him. Thus, his
confrontation rights were not infringed. <u>Maryland v.
Craig</u>, 497 U.S. 836, 844-50, 110 S.Ct. 3157, 3162-66.

(Dkt. No. 17-13 at 35-36.)

## 2.    Analysis

"[T]he Sixth Amendment's right of an accused to confront the witnesses

against him is … a fundamental right and is made obligatory on the States by the

Fourteenth Amendment." *Pointer v. Texas*, 380 U.S. 400, 403 (1965).  The right to

confront a witness includes face to face confrontation and the right to cross-examine.

*Coy v. Iowa*, 487 U.S. 1012, 1019 (1988).  "[T]hough [the Supreme Court]

reaffirm[ed] the importance of face-to-face confrontation with witnesses appearing at

trial," it did not find that "such confrontation is an indispensable element of the

Sixth Amendment's guarantee of the right to confront one's accusers." *Craig*, 497

U.S. at 849–50.  In other words, "the face-to-face confrontation requirement is not

absolute." *Id.* at 850.

Petitioner has not cited to any Supreme Court precedent supporting his right

to an unobstructed view of the witness in the courtroom throughout the witness's

testimony at trial.  The record shows that the prosecutor responded to defense

counsel's objections by moving his position so Petitioner could see Nunez testify.

Because "face to face confrontation" is not absolute, occasional obstructions to Petitioner's line of sight of the witness did not violate the Confrontation Clause. Thus, the Appellate Division's denial of this claim did not involve an unreasonable application of clearly established Federal law. The Court denies Ground One of the amended habeas petition.

### C.    Ground Three of the Petition

In his third ground for relief, Petitioner argues his trial counsel was ineffective in failing to investigate a potential witness, Pablo Acevedo, and to subpoena him for trial. (Dkt. No. 4 at 11.) Acevedo, a co-defendant, sent two letters and an affidavit to Petitioner, expressing his willingness to testify on his behalf regarding false information he provided to law enforcement. (Dkt. No. 9 at 97-99.) Petitioner alleges his trial counsel was negligent for failing to exercise due diligence in pretrial investigation of this potential witness. (*Id.*)

Respondents oppose relief on this ineffective assistance claim for several reasons. (Dkt. No. 17 at 74-81.) First, Acevedo's affidavit (Dkt. No. 17-6) does not exonerate Petitioner, provide him an alibi, or say anything about his willingness to testify on Petitioner's behalf at trial. Second, by the time of Petitioner's trial, Acevedo had been convicted for his participation in the event. He had given a full confession, despite his protestation that it was coerced, which was admitted into evidence at Acevedo's trial. (Dkt. No. 17-5). The State would have been able to use Acevedo's statement against him. Additionally, defense counsel's certification on post-conviction relief makes clear that he believed the co-defendant's testimony

would have been damaging to Petitioner's case. Respondents contend the PCR court and Appellate Division properly denied this claim of ineffective assistance of counsel.

### 1.    The highest reasoned state court decision

For habeas review, the highest reasoned state court determination of this claim was that of the Appellation Division on PCR appeal.  Petitioner did not identify a factually similar Supreme Court case. Therefore, the question is whether the Appellate Division's determination of the claim involved an unreasonable application of clearly established Federal law. The Appellate Division determined:

> [a] criminal defense attorney's decision to call or not to call witnesses is a matter of trial strategy generally entitled to presumptive deference. As the Court has explained:
>
>> Determining which witnesses to call to the stand is one of the most difficult strategic decisions that any trial attorney must confront. A trial attorney must consider what testimony a witness can be expected to give, whether the witness's testimony will be subject to effective impeachment by prior inconsistent statements or other means, whether the witness is likely to contradict the testimony of other witnesses the attorney intends to present and thereby undermine their credibility, whether the trier of fact is likely to find the witness credible, and a variety of other tangible and intangible factors. Therefore, like other aspects of trial representation, a defense attorney's decision concerning which witnesses to call to the stand is "an art," and a court's review of such a decision should be "highly deferential."

[State v. Arthur, 184 N.J. 307, 320-21 (2005) (citations omitted).]

These principles of deference extend to counsel's decisions especially where a defendant asserts an alibi defense. While an attorney's "[f]ailure to investigate an alibi defense is a serious deficiency that can result in the reversal of a conviction," State v. Porter, 216 N.J. 343, 353 (2013), "[c]ounsel's fear that a weak alibi could cause more harm than good is the type of strategic decision that should not be second guessed on appeal," State v. Drisco, 355 N.J. Super. 283, 291 (App. Div. 2002) (emphasis added); see also State v. Coruzzi, 189 N.J. Super. 273, 321-22 (App. Div. 1983) (finding no error in not calling the defendant's brother as alibi witness, when the testimony was contradicted by other, credible witnesses and could "undermine the entire defense strategy"). Applying these principles, we conclude the evidence in the record established that in not pursing Acevedo as a witness, defendant's trial counsel made a knowing and intelligent strategic decision that cannot support a claim of IAC. Generally, although "a suspicious or questionable affidavit supporting a PCR petition 'must be tested for credibility and cannot be summarily rejected,'" Porter, 216 N.J. at 355 (quoting State v. Allen, 398 N.J. Super. 247, 258 (App. Div. 2008)), defendant's trial counsel conducted an investigation into whether Acevedo would be helpful to defendant's cause before deciding not to pursue him as a witness. This finding stands regardless of when trial counsel was first provided with the affidavit and letters that defendant relied upon.

Defendant's trial counsel, after contacting Acevedo's attorney and examining Acevedo's trial transcript, made the decision not to call Acevedo as a witness, which falls within trial strategy. Counsel's decision was supported by the fact that Acevedo confessed to the crime, implicating defendant as the man who shot at the police officer. Acevedo's confession was admitted in evidence at his own trial, which would impeach any contrary testimony Acevedo would have given in this case. Further, besides stating that defendant was not present at the burglary that night, neither Acevedo's affidavit nor the letters provided

65

any information creating a reasonable doubt about defendant's guilt. See State v. Pierre, 223 N.J. 560, 588 (2015) (holding that it was IAC for trial counsel not to call witnesses who submitted affidavits placing the defendant in a different State at the time the crime was committed and whose testimony would have reinforced defendant's alibi evidence established by an out-of-state traffic ticket). Even if trial counsel's actions were deficient, the evidence against defendant was substantial, including the testimony from another codefendant and defendant's own pretrial statements to a third party, both of which implicated defendant.

(Dkt. No. 17-35 at 2-8.)

### 2.    Analysis

The following discussion in *Strickland* is relevant to counsel's decision not to call a particular witness.

Those strategic choices about which lines of defense to pursue are owed deference commensurate with the reasonableness of the professional judgments on which they are based. Thus, when counsel's assumptions are reasonable given the totality of the circumstances and when counsel's strategy represents a reasonable choice based upon those assumptions, counsel need not investigate lines of defense that he has chosen not to employ at trial.

*Strickland*, 466 U.S. at 681 (internal quotation marks and quotation omitted). Here, defense counsel contacted Acevedo's attorney and examined Acevedo's trial transcript. He determined not to call Acevedo because his trial transcript, which contained his confession, would be used to impeach his testimony at Petitioner's trial. It was reasonable to conclude Petitioner's defense was more likely to succeed without a witness whose credibility was suspect because he gave two different

versions of the events. Reasonable jurists would agree that not calling Acevedo as a witness was a reasonable strategic decision by defense counsel.  Therefore, Petitioner has not established the state court's determination involved an unreasonable application of the *Strickland* test for ineffective assistance of counsel. Therefore, the Court denies Ground Three of the amended habeas petition.

### F.    Ground Four of the Petition

In the remaining claim under Ground Four, Petitioner argues his trial counsel was ineffective by failing to file a timely motion for a new trial based on newly discovered, exculpatory evidence from Pablo Acevedo. (Dkt. No. 9 at 13.) Petitioner alleges that defense counsel, upon learning of Acevedo's willingness to testify on Petitioner's behalf regarding false information given to the police, should have filed a timely motion for a new trial. (Dkt. No. 9 at 99-101.)

Respondents oppose relief on Ground Four because Petitioner's motion for a new trial would have failed under the three part test described in *State v. Vaszorich*:[7] the new evidence must be: (1) material to the issue and not merely cumulative, nor impeaching or contradictory, (2) discovered since the trial and be evidence that could not have been  discovered before trial by the exercise of due diligence, and (3) the evidence would probably change the result if a new trial were granted. (Dkt. No. 17 at 82-84.)

As to the third prong of the test,

---

[7] 13 N.J. 99, 130 (1953), *cert. denied*, 346 U.S. 900, 74 S.Ct. 219 (1953).

> Newly discovered evidence must be reviewed with a
> certain degree of circumspection to ensure that it is not the
> product of fabrication, and, if credible and material, is of
> sufficient weight that it would probably alter the outcome
> of the verdict in a new trial.

(Dkt. No. 17 at 82, quoting State v. Ways, 180 N.J. 171 (2004)).  As discussed in

Ground Three above, Respondents assert Acevedo was not credible. Thus, newly

discovered evidence based on his statements were unlikely to have changed the

outcome if a new trial was granted. Respondents submit that Acevedo's testimony

would have damaged Petitioner's defense because Acevedo's in-depth confession,

detailing Petitioner's participation in the crimes, would have been used to impeach

him and bolstered the State's evidence against Petitioner.  The Appellate Division

affirmed the PCR court's denial of this claim, "for the reasons set forth in his written

decision." (Dkt. No. 17-35 at 10-11.) Therefore, the highest reasoned state court

decision is that of the PCR court. Petitioner did not identify a factually similar

Supreme Court case that governs this claim. Therefore, habeas review is whether the

PCR court's decision involved an unreasonable application of clearly established

Federal law.

### 1.    Highest reasoned state court decision

The PCR court ruled as follows.

> Petitioner contends trial counsel should have filed a
> motion for a new trial, based on newly discovered
> evidence, in particular, Acevedo's affidavit and letters.
> Petitioner argues trial counsel failed to timely file a motion
> for a new trial under R. 3:20-1. Petitioner asserts trial
> counsel only attempted to raise the issue of new evidence

during sentencing, which Judge Delehey refused to consider.

Rule 3:20-1 provides, in relevant part, "that the trial judge on petitioner's motion may grant the petitioner a new trial if required in the interest of justice…. the trial judge shall not, however, set aside the verdict of the jury as against the weight of the evidence, unless having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a manifest denial of justice under the law."

To grant a new trial based on newly discovered evidence, the evidence must be (1) material to the issue and not merely cumulative or impeaching or contradictory; (2) discovered since the trial and not discoverable by reasonable diligence beforehand; and (3) of the sort that would probably change the jury's verdict if a new trial were granted. *State v. Carter*, 85 N.J. 300, 315 (1981).

Petitioner's argument is unpersuasive. Petitioner does not meet the third prong. Under the third prong, in order to grant a new trial, the evidence must be of the sort which would probably change the jury's verdict if a new trial were granted. Here, the evidence at issue is not likely to change the jury's verdict. As stated above, Acevedo is not a credible witness, Acevedo's affidavit is contradictory to his testimony at his own trial. He would be subject to impeachment based on his contradictory statement as well as his full confession. A reasonable jury would likely come to the same conclusion as before and find the petitioner guilty. Thus, this Court finds trial counsel was not ineffective for not filing a motion for new trial due to the third prong failing.

(Dkt. No. 17-26 at 19-20.)

## 2.   Analysis

At his sentencing hearing on February 12, 2012, Petitioner asked Judge

Delehey to consider two letters (Dkt. Nos. 17-7, 17-8) that he had just provided to

defense counsel from co-defendant Pablo Acevedo. (Dkt. No. 18-17 at 8-9.) Judge

Delehey refused to consider the letters, dated October 31, 2011, and November 17,

2011, because they were not sentencing matters.  (Dkt. No. 18-17 at 9-10.) Acevedo's

affidavit was also submitted into the record on PCR proceedings. (Dkt. No. 7-6.)

In his affidavit, Acevedo said he was arrested for criminal trespass on June 9,

2006, and he told the interrogating officers that he knew nothing about a robbery of a

check cashing place. (*Id.*) Acevedo further stated the officers told him that an officer

had been shot during that robbery, they knew he didn't do it, and they threatened to

make him disappear if he did not tell them what he knew. (*Id.*) Acevedo identified

"Kiko" as the person who had a gun and fired it on the night of the robbery. (*Id.*) He

was nervous about making statements that were not true, but his life was on the line.

(*Id.*) Acevedo's confession, however, was admitted into evidence at Acevedo's trial.

(Dkt. No. 17 at 75, citing Dkt. No. 17-5.) Additionally, in a certification to the PCR

court, Petitioner's trial counsel noted that Acevedo had been convicted by the time

Petitioner went to trial, and he did not believe Acevedo's testimony would be

helpful. (Dkt. No. 17-30 at 24-26.) He further noted that he reviewed Acevedo's trial

transcript and spoke to Acevedo's appellate attorney, and this buttressed his decision

not to pursue Acevedo as a witness. (*Id.*)

Ineffective assistance of counsel "will not be found based on a tactical decision

which had a reasonable basis designed to serve the defendant's interests."  *Werts v.*

*Vaughn*, 228 F.3d 178, 190 (3d Cir. 2000) (citing *Strickland*, 466 U.S. at 690-91).

Defense counsel's certification, submitted in the PCR proceedings, identifies

counsel's reasonable determination that Acevedo was not credible, and his testimony would not be helpful to Petitioner.  Therefore, the failure to bring a motion for a new trial based on Acevedo's letters and affidavit was not deficient performance by counsel, nor did it prejudice Petitioner because the motion was unlikely to be granted.  Therefore, the Court denies this ineffective assistance of counsel claim in Ground Four of the amended petition.

### E.    Procedurally Defaulted Claims

Respondents contend that Petitioner failed to exhaust his state court remedies on part of Ground Four and all of Ground Five of his habeas petition, and that these grounds for relief are procedurally defaulted.

### 1.    Ground Four is Partially Unexhausted and Lacks Merit

Ground Four consists of two claims. The allegedly unexhausted claim is that cumulative errors of trial counsel violated Petitioner's Sixth Amendment right to counsel. Petitioner raised the cumulative errors of trial counsel claim in his first PCR petition. (Dkt. No. 17-30 at 11.) He did not include this claim in his first PCR appeal (Dkt. No. 17-28 at 3), or in his petition for certification to the New Jersey Supreme Court. (Dkt. No. 17-36.) He did not raise this claim in his second PCR petition. (Dkt. No. 17-39.) Finally, Petitioner does not address his failure to exhaust this claim in his reply brief. (Dkt. No. 21.) Exhaustion of state court remedies requires a petitioner to bring the claim through one complete round of the State's established appellate review process. *O'Sullivan*, 526 U.S. at 844-45. Petitioner has not done so.

Respondent further argues this claim is procedurally defaulted because state court procedural rules bar Petitioner from returning to the state courts to exhaust this claim. District courts, however, may deny unexhausted habeas claims if they fail on the merits.  28 U.S.C. § 2254(a). For the reasons discussed in this Opinion, Petitioner has failed to establish any claim of ineffective assistance of counsel. Therefore, he cannot establish that counsel's cumulative errors denied him effective assistance of counsel. Therefore, the Court denies the cumulative errors of trial counsel claim in Ground Four.

### 2.      Ground Five is Procedurally Defaulted

In Ground Five of his amended habeas petition, Petitioner alleged his trial counsel was ineffective by failing to argue that defendant's alleged inculpatory statement to the arresting Dominican Republic police officer should have been suppressed because it occurred after Defendant's indictment, without counsel present.  (Dkt. No. 9 at 15.)

Respondents submit that Petitioner raised Ground Five of his amended habeas petition for the first time on appeal from denial of his motion for post-conviction relief. The Appellate Division found the claim procedurally barred under N.J.Ct.R. 3:22-4(a) because Petitioner had not previously raised the claim.  (Dkt. No. 17-35.) The New Jersey Supreme Court rejected Petitioner's argument that the Appellate Division erred by finding the claim procedurally barred. (Dkt. No. 17-38.) Petitioner then brought the claim in his second motion for post-conviction relief.  (Dkt. No. 17-39.) The PCR Court found the claim time-barred under N.J.Ct.R. 3:22-12. (Dkt. No.

17-40.) Petitioner did not appeal the PCR court's denial of his second motion for post-conviction relief. In his reply brief, Petitioner contends he properly raised this claim after this Court granted him permission to amend his habeas petition after the Appellate Division, and Supreme Court of New Jersey failed to rule on the merits. (Dkt. No. 21 at 6.)

Ground Five was not exhausted in the state courts because Petitioner did not raise the claim in one complete round of New Jersey's established appellate review process. He failed to raise the claim in his first PCR petition, which he attributes to his PCR counsel. Thus, he raised the claim for the first time in his appeal of the denial of his first PCR petition. Petitioner then raised this claim in his second PCR petition. It was denied, and he failed to appeal. By granting Petitioner's motion to amend his petition to assert Ground Five, this Court did not make a finding that any state procedural bar was excused under the cause and prejudice standard. Petitioner argues that his procedural default of this claim in his first PCR proceedings should be excused because his PCR counsel provided ineffective assistance by failing to raise the claim.  Therefore, this Court will address whether cause and prejudice excuses procedural default of Ground Five of the amended habeas petition.

### 3.    Cause and Prejudice Standard

In *Trevino v. Thaler*, the Supreme Court held

> where, as here, state procedural framework, by reason of its design and operation, makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal, our holding in *Martinez* applies:

> "[A] procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." [*Martinez v. Ryan*,] 566 U.S. [1 ], 132 S.Ct. [1309,] 1320 [2012].

569 U.S. 413, 429 (2013).

New Jersey post-conviction procedures, like the Texas post-conviction procedures reviewed by the Supreme Court in *Trevino*, permit ineffective assistance of counsel claims to be raised on direct appeal.  *State v. Preciose*, 129 N.J. 451, 474 (1992) (discussing N.J.Ct.R 3:22-4). In New Jersey, ineffective assistance of counsel claims are almost always raised in post-conviction proceedings. *Jin Sig Choi v. Warren*, No. CIV. 12-3473 KM, 2015 WL 4042016, at *24 (D.N.J. June 30, 2015). Nonetheless, the *Martinez* holding is applicable. *Id.*; *Centeno v. Davis*, No. CV 16-2779 (RMB), 2022 WL 865816, at *14 (D.N.J. Mar. 23, 2022).

The Third Circuit Court of Appeals set forth the following framework to determine if a habeas petitioner satisfied the cause and prejudice standard under *Martinez*.

> [A] procedural default of those claims will not bar their review by a federal habeas court if three conditions are met: (a) the default was caused by ineffective assistance of post-conviction counsel or the absence of counsel (b) in the initial-review collateral proceeding (i.e., the first collateral proceeding in which the claim could be heard) and (c) the underlying claim of trial counsel ineffectiveness is 'substantial'[.] *Cox v. Horn*, 757 F.3d 113, 124 (3d Cir. 2014) (quoting *Martinez*, 566 U.S. at 14, 132 S.Ct. 1309).

74

*Preston v. Superintendent Graterford SCI*, 902 F.3d 365, 376 (3d Cir. 2018).  For the reasons discussed below, Petitioner's ineffective assistance of PCR counsel claim fails on the first prong of the test, his underlying claim of trial counsel ineffectiveness is not substantial.

Petitioner asserts his trial counsel was ineffective by failing to argue that Petitioner's inculpatory statement should not have been admissible at trial because Petitioner did not knowingly and voluntarily waive his right to counsel during police interrogation. (Dkt. No. 9 at 15.) Petitioner relies on state law governing post-indictment *Miranda* warnings. In support of this claim, Petitioner alleges the following facts:

> Petitioner was arrested in the Dominican Republic two years after he was indicted. It was alleged by the Dominican police officer that Petitioner made inculpatory statements in regards to using a gun. Defense counsel moved to suppress the alleged statements. Although he argued at the N.J.R.E. hearing for the suppression of the alleged statements. Defense counsel omitted the critical legal issue that "after a defendant has been indicted, the administration of <u>Miranda </u>warnings during a police-initiated interrogation is not adequate to elicit a knowing voluntary waiver of the right to counsel during such police initiated interrogation.

(Dkt. No. 9 at 15, 124-29, citing *State v. Sanchez*, 129 N.J. 261 (1992)).

Respondents oppose the underlying ineffective assistance of counsel claim because:  (1) there was no custodial interrogation; (2) federal law permits a petitioner to waive his *Miranda* rights post-indictment; (3) Petitioner was not in custody of any U.S. law enforcement; and (4) Petitioner's statements were not made in response to

any type of substantive questioning or conversation initiated by anyone with knowledge of the facts of the case. (Dkt. No. 17 at 86-91.)

In his reply brief, Petitioner asserts that the State failed to establish the knowing and voluntary waiver of his right to counsel during questioning, a violation of his Fifth Amendment right against self-incrimination. (Dkt. No. 21 at 4.)  This, however, was not the claim Petitioner asserted in his amended habeas petition, which relied solely on ineffective assistance of counsel, based on the failure to advise the court of state law governing waiver of the right to counsel during custodial interrogation under the New Jersey Constitution. (Dkt. No. 4 at 124-29). A claim for violation of the New Jersey Constitution is not a cognizable habeas claim. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). This Court will address the Sixth Amendment ineffective assistance of counsel claim, based on counsel's alleged failure to instruct the state court on the application of *Sanchez* to Petitioner's case.

### 4.    The State Court's Findings of Fact and Admission of Petitioner's Statements to Captain Serrano

After hearing all the testimony in a pretrial Rule 104 hearing, the trial court ruled as follows.

> The Court has before it the issue of whether alleged oral statements or statements made by the defendant Kelvin Rosa may be introduced into evidence. The Court has conducted an evidence Rule 104 hearing, it has heard the testimony of Captain Rafael Augusto Villetta-Serrano of the Dominican Republic Police and it has heard the testimony of the defendant Kelvin Rosa.

> The Court observed both of the witnesses on the stand. And in order to resolve this matter, the Court is required to

make a finding beyond a reasonable doubt that the defendant knowingly and voluntarily gave a statement to Officer Serrano, that statement being that he, the defendant, had to shoot someone. The circumstances surrounding all of this are that the defendant on three occasions was charged with offenses in the United States, bail was posted, he initially returned to his native country, the Dominican Republic following the death of his mother and his sister. He was in the United States a short time and was charged with the present offense. Bail was posted. He returned to the Dominican Republic. And the defendant says he did so because his father was ill. Ultimately, the United States obtained his extradition. That resulted from an arrest that occurred on November 12, 2008 in the Dominican Republic, an arrest made by Captain Serrano and other members of the Dominican Police Department.

At the time of the arrest, it is contended that the defendant made a statement inculpating himself in the October 14, 2004 robbery and - - robbery of United Check Cashing Service  and the shooting of a Willingboro police officer, that officer being Richard Rodgers. The Court has been aided by interpreters in hearing the testimony of both witnesses. It has nonetheless been able to judge the credibility of those witnesses. It has an opportunity - - it had the opportunity to observe their demeanor on the stand. It is aware that their testimony is in opposition to one another. There is no hybrid version of what occurred here.

Captain Serrano says that he gave a statement - -  that he issued to the defendant - -  what we consider <u>Miranda</u> warnings, that is advising him that any statements that he made could be used against him, that he was entitled to the services of an attorney and so forth. The defendant says he never received such warnings. The defendant, according to Captain Serrano, volunteered a statement that indicated he had been involved in the October 14, 2004 shooting of Patrolman Rodgers. The defendant says he never made that statement. Captain Serrano says that he read to defendant the charges contained in the order for arrest which has been marked S-1 in evidence and is written in the Spanish language. The defendant, Mr. Rosa,

says he never received such warnings, and the first time he learned of the charges against him was at the airport in the United States when they were read to him in an immigration office.

The Court does not have to pick one version or the other. Rather, the Court sees it this way, it must determine whether the State has offered proof beyond a reasonable doubt that defendant made the statements to Captain Serrano as Captain Serrano says they occurred.

But in terms of credibility, the Court finds that Captain Serrano's testimony was credible and believable. The Court applies the standard methods for judging the credibility of a witness, the interest or lack of interest that any witness has in the outcome of the case. Captain Serrano had no axe to grind here. This was not his investigation. Although he was the lead officer on the arrest, he was not involved in any way in the prosecution of this case here in the United States in New Jersey. The Court can't find any bias that's been presented during his testimony. Certainly Captain Serrano who has four years of a legal education and 19 years [of] experience as a police officer should have[,] and did have in the Court's opinion[,] the mental capacity for knowing that about which he spoke. Granted, language barriers sometimes make obtaining precision difficult. In terms of his demeanor, he was straight forward and his answers were given promptly to the questions asked. And there is an inherent believability in what he stated.

The Court reaches that conclusion based upon the fact that at no time has any evidence been presented that Captain Serrano knew the details of the charges in the United States, and yet he says the defendant made a statement about shooting someone or having to shoot someone. The Court finds his testimony credible.

In terms of the defendant, Mr. Rosa, the Court learned that he was in the United States in 2004 in October at the time that the events charged in the indictment occurred. The Court learned that he went to the Dominican

Republic and that he was extradited from the Dominican Republic having waived his right to a hearing.

In terms of Mr. Rosa's recollection of events and the charges previously lodged against him in related or unrelated matters, his recollection can be described only as faulty at best. He recalled very little about the events. He said that he had no specific recollection of many of the charges. And when asked about the extradition proceeding in the Dominican Republic, he informed the Court that he signed an extradition waiver but there was no indication at all what it referred to. He may have believed that it was for a prior charge, but he didn't say that, he just didn't know. The Court notes that Mr. Rosa, by virtue of his arrests and posting of bail, while hardly having the ability of an attorney, is nonetheless not a novice with the criminal justice system. It is hard for the Court to believe that he didn't at least see some document that told him what he was being charged with in the United States.

And finally, it seems somewhat outrageous to the Court that the Dominican Court would not protect its own citizen and advise him of the charges or provide him with documents which would enable him to know specifically what the charges are against him.

The Court places no real value on Mr. Rosa's testimony. But again, the resolution of this matter depends not so much on Mr. Rosa and comparing him with Captain Serrano, but rather with Captain Serrano's testimony itself. And here the Court, again, finds that his testimony was credible. The Court makes the following findings of fact: [t]hat the defendant was in the United States at the time of the offense. Eventually he left the United States, bail having been posted. And he left the United States in early 2005. It was almost four years later in November of 2008 that he was arrested in the Dominican Republic and at that time was using an alias. He offered reasons for which he uses the name Martinez. And while those reasons are plausible, the Court is satisfied that he used the name Martinez for the purpose of avoiding or evading prosecution.

The Court heard testimony concerning the statement made by defendant, that statement being to the effect that he had to use a gun. The Court noted an inconsistency raised by defense counsel, that is initially the Court was told that the statement was made and that the statement did not relate to the robbery charge. But later the Court itself inquired of the witness, and the reason the Court inquired, it gathered from the witness' testimony that he was mixing his own opinions or conclusions that these matters were related and not separating them from what it is that Mr. Rosa said.

So the Court asked the defendant - - or the witness, Captain Serrano, rather specific questions to find out when the statement was made and whether there had been any mention of a robbery. Captain Serrano said no, the word robbery was never mentioned, but that the defendant had told him in the vehicle, later determined to be the bus, that he had shot someone because he had to.

The defendant volunteered that he did expect to be arrested but Captain Serrano said he seemed to be surprised to be arrested at the time that the arrest order was executed. The defendant mentioned a gun, he mentioned a shooting. The Court is satisfied that having heard the testimony of the two witnesses, and it is satisfied beyond a reasonable doubt that Mr. Rosa did make the statement concerning the gun and having to shoot somebody to Captain Serrano. It finds that the evidence is relevant - -  it is critical. It was made - -  the statement was made knowingly and voluntarily and it admits that statement into evidence.

(Dkt. No. 18-7 at 36-39.)

## 5.   Analysis

A habeas court must presume a State court's factual findings to be true; unless the petitioner rebuts the presumption by clear and convincing evidence. § 2254(e)(1). Petitioner submits, in his reply brief, that he did not sign the card Captain Serrano

claims to have shown him, which described his rights to an attorney and to remain silent, under Dominican Republic law. (Dkt. No. 21 at 3.) Captain Serrano, however, testified that he did not ask Petitioner to sign the card; it was not necessary. (Dkt. No. 18-7 at 15-16.) The state court gave good reasons for finding Captain Serrano's testimony of Petitioner's arrest credible, and the lack of Petitioner's signature on the card is not clear and convincing evidence that Petitioner did not volunteer a statement to Captain Serrano without being subject to interrogation.

Petitioner further argued that this Court should conduct a plenary review of the Rule 104 hearing. (Dkt. No. 21 at 3.) Section 2254(e)(1), however, requires Petitioner to rebut the presumption of the state court's findings of fact with clear and convincing evidence. Petitioner has not rebutted the state court's factual finding that Petitioner volunteered his statements about a gun and a shooting to Captain Serrano, who did not know the details about the New Jersey charges. (Dkt. No. 21.) The State court's finding that Petitioner volunteered the inculpatory statements controls.

The question remains whether Petitioner has a substantial claim that his trial counsel was ineffective by failing to inform the trial court of the holding of the New Jersey Supreme Court in *State v. Sanchez*, 129 N.J. 261, 276-77 (1992). In *Sanchez*, the New Jersey Supreme Court held "the post-indictment interrogation of defendant violated his right to counsel under article 1, paragraph 10 of the New Jersey Constitution." *Id.* at 279. *Sanchez* is distinguishable in an important respect, which leads to the conclusion that counsel was not ineffective for failing to argue its application to Petitioner's case. Sanchez was charged with homicide and unlawful

possession of a weapon. *Id.* at 263. Sanchez, unlike Petitioner, was interrogated by law enforcement who were investigating the charges against him and were involved in his prosecution. *Id.* at 263-64.  The New Jersey Supreme Court explained that "[t]he purpose of the Sixth Amendment right to counsel is to enable the defendant to confront the prosecution and to ensure the integrity of the judicial process." *Id.* at 265. Thus, the New Jersey Supreme Court declined to extend the holding of the U.S. Supreme Court in *Patterson v. Illinois*, 487 U.S. 285, 290–91 (1988), that *Miranda* warnings sufficed to support a waiver of the defendant's Sixth Amendment right to counsel post-indictment, as a sufficient waiver under the New Jersey Constitution. *Id.* at 271-79.

It is significant that Captain Serrano was not involved in Petitioner's prosecution in any manner, and he had no connection with U.S. law enforcement beyond arresting individuals for potential extradition. There was no reason for Captain Serrano to interrogate Petitioner on the charges, of which he knew nothing beyond what he read to Petitioner. Petitioner was not "confronting the prosecution" when he spoke to Captain Serrano. Therefore, counsel was not ineffective for failing to argue that the *Miranda*-like warning given to Petitioner by Captain Serrano after Petitioner's indictment was insufficient to establish a knowing and voluntary waiver of Petitioner's pretrial right to counsel and to remain silent. Thus, Petitioner did not establish cause and prejudice to excuse his procedural default of Ground Five.

## IV.    CERTFICATE OF APPEALABILITY

Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254. 28 U.S.C. § 2253(c)(1). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327. Under Federal Rule of Appellate Procedure 22, a certificate of appealability is not required when "a state or its representative" appeals.  Fed. R. App. P. 22(b)(3).

"When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Here, reasonable jurists would not find the Court's ruling debatable.  To the extent that relief is granted on the petition, no certificate of appealability is needed for appeal, and to the extent that relief on the petition is denied, a certificate of appealability is not warranted.  Accordingly, no certificate of appealability shall issue.

V.    **CONCLUSION**

For the reasons discussed above, the Court denied the amended habeas petition.


An appropriate Order follows.


Date:  **March 31, 2023**

<u>s/Renée Marie Bumb</u>
RENÉE MARIE BUMB
Chief United States District Judge